ALLISON *v.* STATE.

Opinion delivered March 11, 1905.

1. CAPITAL CASE—FAILURE TO FURNISH COPY OF INDICTMENT.—One accused of a capital crime cannot complain that he was arraigned over his objections without a copy of the indictment being served on him as required by law, if a copy duly served on him contained a merely clerical omission of his name in one place, especially if he was not convicted of a capital offense.

2. CONTINUANCE—NON-RESIDENT WITNESSES.—It was not error in a murder case to refuse a continuance for the absence of non-resident witnesses who were not present at the killing and were wanted merely to prove the character of defendant and deceased, if deceased had lived in this State many years, and defendant over a year.

3. SAME—WHEN PROPERLY REFUSED.—Refusal of a continuance on account of the absence of a witness was not error where the motion did not disclose where he could be found.

4. MANSLAUGHTER—DUTY TO INSTRUCT AS TO.—Evidence in a murder case that tended to prove that defendant shot deceased because deceased cursed him, and then attempted to draw a pistol on him in a threatening manner, was sufficient to call for a proper instruction as to voluntary manslaughter, as the jury might have found that defendant acted under the belief that he was about to be assaulted, but that he acted without due care.

5. SAME.—A request for instruction in a murder case which told the jury that any kind of provocation that was calculated to arouse and did arouse an irresistible passion in the breast of defendant was

sufficient to reduce the killing to manslaughter was misleading, and was properly refused.

Appeal from Desha Circuit Court.

ANTONIO B. GRACE, Judge.

Affirmed.

## STATEMENT BY THE COURT.

Warren Baldwin, a conductor in the employ of the Iron Mountain Railway Company, on the 18th of September, 1904, had charge of a passenger train on that road. This train passed the town of Dermott at about 2 o'clock in the morning, and was going northward. Several passengers boarded the train at Dermott, among them being O. J. Allison, a section foreman in the employ of the same road. Allison had come down from McGehee, a station a few miles north, on a handcar with some negroes, and was returning to McGehee on the train. As Allison was in the employ of the company, he made some objection to paying his fare; but as he had no pass, Baldwin the conductor, required him to pay his fare to McGehee, it being only 21 cents. After he had paid his fair, Allison asked the conductor for a cash fare receipt, and the conductor told him he would give him one so soon as he could get the blank receipts, and he sent the porter to get the receipts. Allison followed the conductor forward into the negro coach to get the receipts, but, while the receipt was being prepared, or just after it was prepared, he got into a quarrel with the conductor, whereupon he pulled out his pistol and shot the conductor, killing him instantly.

There is some conflict in the evidence as to the facts, though the majority of the witnesses present at the killing testified that Baldwin, the conductor, was making no demonstration whatever towards Allison at the time he was shot, and that he had said nothing to him calculated to arouse him to anger, except to tell him that he did not want to have any trouble with him. The

testimony of these witnesses tends to show that it was an unprovoked murder, with nothing to mitigate or excuse the crime. According to these witnesses, Allison killed the conductor for no other reason than on account of anger at him for not permitting him to ride free of charge and compelling him to pay 21 cents. But the defendant and one of the witnesses for the defense testify to a different state of facts.

Lee Judson, a negro witness for the defendant, testified as follows:

"I had went to Dermott on a handcar, and after we gets to Dermott, Mr. Allison says: 'Lee, you stay, and go up on the train, and I will pay your fare to McGehee.' We gets on the train, and meets the conductor, and the conductor asks him where was his pass, and he said, 'I have not got one,' and the conductor said: 'Fare,' and he pulled out a dollar, and gave him two fares, and the conductor gave him back the change, and said to him: 'Go back to your own coach,' and he said: 'Give me a cash fare receipt,' and he said, 'I will give you nothing; don't worry me,' and they go out, and after a leetle they come back, the conductor first, and Mr. Allison after him, and Mr. Allison asked for a cash fare receipt, and he said, 'I will give you one as soon as my porter goes and gets them,' and the porter goes and gets them, and brings them to the conductor, and the conductor said: 'You are one of those smart Alecks, and I am not afraid of you,' and Allison said: 'I am not afraid of you,' and he cursed Mr. Allison, and said 'God damn you!' and reached back after his gun, and Mr. Allison said: 'Whoa, that don't go!' and the conductor stepped up towards Mr. Allison, and he shoved him back with one hand, and shot him.

He further stated that Allison had not attempted to draw his pistol before the conductor drew his weapon. On being asked what the conductor was doing at the time he was shot, he answered that "he was pulling out his gun, and walking up on Mr. Allison when he shot him," and that witness saw the weapon he was attempting to draw."

Allison testified that he followed the conductor into the negro coach with no intention of having a difficulty with him, but only to secure the cash fare receipt. His statement of the altercation that led to the shooting was as follows:

"I walked up and sat down on the end of a seat, and waited until he got through collecting his fares, and I said: 'Captain, I would like to have those cash fare receipts,' just that way, and he said, 'I have been bothered with you enough,' and I said, 'No, you haven't,' and he said that you are a God-damned liar, and I said, 'You are another one!' and when he made the remark, and called me a God-damned liar, he started down in his pocket after his gun, and I said 'Whoap! that don't go!' and when I

seen he had his gun, coming up with it, I knew that he was going to shoot me, and I jerked my gun out, and pulled the trigger, and had no idea of hitting him, but just shot to save my life."

The presiding judge instructed the jury correctly as to murder in the first degree and second degree, and as to the law of self-defense, but refused to give the following instruction, asked by the defendant, on voluntary manslaughter: "If the jury believe from the evidence that on the night of the alleged killing in this case the defendant, O. J. Allison, was on the train of which the deceased, Warren Baldwin, was conductor, and further find that *said Allison and Baldwin became engaged in* a dispute or quarrel about a cash fare receipt, and that by reason of said quarrel or dispute Warren Baldwin *manifested or evinced towards the defendant a disposition* calculated to arouse the anger of the defendant, and that you further find that, coupled with this, and as a part of it, the said Warren Baldwin provoked a *passion irresistible in the disposition of Allison*, and that by reason of said passion, if you find one was caused and brought on by the acts or conduct of the said Baldwin, and that acting under the influence of a passion caused by a provocation given at the time by Baldwin *apparently sufficient to make a killing irresistible in the mind of the defendant,* and that, acting under the influence of said passion, the defendant then and there shot and killed Warren Baldwin; if you further find that said shooting was sudden,

without malice or deliberation or premeditation, and in the heat of passion, you should find the defendant guilty of manslaughter, the punishment for which is not more than seven nor less than two years' imprisonment in the State penitentiary."

No instructions in reference to manslaughter were given. The jury returned a verdict of guilty of murder in the second degree, and fixed the punishment at ten years' imprisonment in the penitentiary.

The defendant appealed.

*X. O. Pindall* and *Campbell & Stevenson,* for appellant.

The court erred in arraigning appellant before he had been served with a true copy of the indictment as provided by law. Sand. & H. Dig. § 2274; 46 Ark. 141; 24 Ark. 629; 19 Ark. 613. Appellant's motion for continuance should have been granted. 16 Ill. 507; 92 Ky. 68; Kirby's Dig. § 2311. It was error for the court to permit defendant to be questioned about a conviction of another offense. 2 Ark. 229; 34 Ark. 649; 37 Ark. 261; 38 Ark. 221; 45 Ark. 165; 39 Ark. 278; 52 Ark. 303; 73 Ark. 152; 62 Ark. 126; 68 Ark. 577. The court erred in refusing to instruct the jury upon the charge of manslaughter. 36 Kan. 497; 52 Kan. 335; 27 Tex. App. 16; 28 Tex. App. 542; 43 Ark. 289; 110 U. S. 582; 52 Ark. 345; 43 Ark. 289.

*Robert L. Rogers, Attorney General,* for appellee.

The failure to furnish true copy of indictment was not prejudicial error. 43 Ark. 391; 46 Ark. 141. The matter of granting a continuance was purely a matter within the discretion of the trial judge. 26 Ark. 323; 54 Ark. 243; 57 Ark. 165. The variance in the copy of the indictment furnished was not material. 39 La. Ann. 1060.

Riddick, J., (after stating the facts.) This is an appeal by O. J. Allison from a judgment convicting him of murder in

the second degree, and sentencing him to confinement in the State penitentiary for a term of ten years. Allison was a section foreman in the employ of the Iron Mountain Railway Company, and had charge of a gang of men at McGehee, Arkansas. Warren Baldwin, the man he killed, was a conductor in the employ of the same company. On the 18th day of September, 1904, he had charge of a passenger train bound northward from some point in Louisiana to Little Rock. This train arrived at Dermott, in this State, about 2 o'clock in the morning of that day. Allison and a negro man, Lee Judson, got on the train at Dermott to go to McGehee. Allison had come down from McGehee on a handcar the evening before with Lee Judson and some other negroes. The negroes returned on the handcar, with the exception of Judson, who, at Allison's request, remained to return on the train with him. As Allison was in the employ of the railway company, he made some objection to paying his fare; but as he had no pass, the conductor required him to pay the fare, which was only 21 cents. After he had paid the fare, Allison asked the conductor for a cash fare receipt. The conductor told him he had no blank receipts with him, but would send the porter to bring them from another part of the train, and he thereupon told the porter to get the receipts. Allison followed the conductor forward into the negro coach to get the receipt, but, while the receipt was being prepared, he got into a quarrel with the conductor, whereupon he pulled out his pistol and shot the conductor, killing him instantly.

Several witnesses for the State testified that the conductor made no assault on Allison, that he said nothing to him calculated to offend or anger any reasonable person, but that Allison seemed angry, spoke harshly to the conductor, and suddenly fired upon and killed him. On the other hand, both Allison and the negro, Lee Judson, testified that Allison neither spoke harshly nor made any attempt to draw a pistol until the conductor cursed Allison and attempted to draw a pistol as if to shoot him.

There are several questions presented by the appeal which have been discussed in the brief and oral argument of counsel for defendant. We have duly considered all of them, but find that it is necessary to refer to but a few of them here.

The first contention made by the counsel for the defendant is that the court erred "in arraigning the defendant over his objection before the expiration of the 48 hours after the service of a copy of the indictment upon him. But a copy of the indictment had been duly served. 48 hours before the arraignment. The only defect in this copy was that at one place where the defendant's·name appeared in the original it was omitted in the copy and the space left blank. But as the name of the defendant not only appeared in the caption of the indictment, but in three other places in the indictment, and as in the copy it was omitted in only one of these places, it does not seem possible that such a mere clerical oversight could have misled either the defendant or his counsel. Besides, the statute only requires such a copy to be delivered in capital cases; and, though the defendant was indicted for a capital crime, he was convicted of a lower offense. So that, taking the whole record together, it is plain that he was in no way prejudiced by this omission.

It is next contended that the court erred in refusing a continuance. Most of the witnesses whose presence the defendant desired to secure lived in Louisiana. They were not present at the time the killing occurred, and the purpose for which their testimony was desired was to prove the character of the defendant and that of Baldwin, the person slain. As Baldwin had lived in this State many years, and as Allison had been a resident here for over a year, we do not see that it was necessary to send to another State to obtain witnesses to show their characters. The motion for continuance does not show why this was necessary, and under the circumstances we think that it was discretionary with the court to grant or refuse such continuance.

The defendant also asked for a continuance on account of the absence of a witness named Brown, but the motion does not state where Brown was; so far as the motion discloses, he might have been in Mexico, or in a mile of where the court was sitting. If he was near at hand, his presence might have been secured by a brief postponement of the trial; if he was very far away, a continuance might have done no good. As he had been served with summons, he was probably not far off; but the defendant did not ask for a postponement; he asked for a continuance for the term, and this the court refused. It has often been decided

that whether a case should be continued or not is generally a matter within the sound discretion of the trial court. Its refusal to grant a continuance is never a ground for a new trial unless it clearly appears to have been an abuse of such discretion, and manifestly operates as a denial of justice. It does not so appear in this case, and that contention must be overruled. *Jackson* v. *State,* 54 Ark. 243; *Price* v. *State,* 57 Ark. 165.

The next contention is that the court erred in permitting the prosecuting attorney to put certain questions to the defendant in reference to his past habits and conduct. While we are not sure that these questions did not go beyond the bounds of legitimate cross-examination, still we do not see that any prejudice could have resulted, or that, if it be conceded that the court erred in that respect, it would justify a reversal.

The question that has given us the most concern is whether the presiding judge committed a prejudicial error in refusing to instruct the jury as to voluntary manslaughter and the punishment therefor. The indictment in this case was for murder in the first degree, and therefore included, not only murder in the first and second degree, but voluntary manslaughter. The jury, and not the court, are the judges of the weight of the evidence, and for that reason, even though it may seem to the judge that the decided weight of evidence shows the defendant to be guilty of one of the higher grades of homicide, still, if there be evidence tending to show that the defendant is guilty of a lower offense included in the indictment, the defendant has the right to have the question as to whether he is guilty of the lower offense presented to the jury.

A question involving the same principles was discussed by this court in the case of *Flynn* v. *State,* 43 Ark. 289. In that case Flynn was indicted for an assault with intent to kill one Pruitt. The evidence in that case tended to show that Flynn, standing across the street in front of the Capital Hotel of this city, fired three shots with a pistol through the front door of the hotel, while a number of men were standing there, one of them being Pruitt, the party he was accused of having assaulted. The presiding judge in that case ended his charge to the jury by saying to them that the defendant was guilty of an assault

with intent to kill, or that he was guilty of nothing. Chief Justice COCKRILL, who delivered the opinion of the court on appeal, after stating that in every other respect the charge of the court clearly and correctly stated the law of the case to the jury, proceeded to consider the effect of the last remark of the court which we have just quoted. Of this he said that "it left the jury no room to consider anything in regard to the degree of the offense or the nature of the penalty, but cut them off from finding the prisoner guilty of any of the lower grades of assault, as they might have otherwise done. Under an indictment such as we have here," he said, "a prisoner may be convicted of any one of several very grave offenses, an assault with intent to murder being the highest degree, and he has the right to have the judgment of the jury upon the facts uninfluenced by any direction from the court as to the weight of the evidence." The conclusion of the court was that while in that particular case the "charge of the court was morally right, under the law it was error."

This question was considered by the Supreme Court of the United States in a recent case, where the trial judge had ruled that the killing was either murder or else it was done in self-defense, and for that reason he had refused an instruction in reference to manslaughter. In commenting on this ruling, the Supreme Court said: "The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter, or any act performed in self-defense, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court." Again, referring to the argument that the evidence of the defendant tended to show self-defense, the court said: "The fact that the evidence might raise an issue as to whether any crime at all was committed is not in the least inconsistent with a claim that it also raised an issue as to whether or not the plaintiff in error was guilty of manslaughter, instead of murder." The court said that the jury might reject the theory of self-defense, and that it was still a question for the jury to say from all the circumstances whether the crime was murder or manslaughter. *Stevenson* v. *United States,* 162 U. S. 313; *Wallace* v. *United States,* 162 U. S. 466.

On the other hand, there are a number of decisions of this court to the effect that where there is no evidence tending to show that the defendant was guilty of one of the lower degrees of homicide, the court may properly refuse to instruct the jury in reference thereto. These decisions are based on the rule that only disputed questions of fact need be submitted for the decisions of the jury. To quote the language of the court in *Jones v. State:* "The trial court should in no case indicate an opinion as to what the facts establish; but in properly giving the law, the court must of necessity determine whether there is any evidence at all justifying a particular instruction." So in that case a conviction of murder in the first degree was sustained, though the court gave no instruction in reference to the lower grades of homicide; the court saying that, as all the evidence showed that the person killed was assassinated while sitting by his fireside at night by some one who fired through a crack from without, there was no evidence upon which to base instructions as to murder in the second degree or manslaughter. *Jones v. State,* 52 Ark. 345; *Benton* v. *State,* 30 Ark. 328; *Vance* v. *State,* 70 Ark. 272.

In each case, then, the question of whether it is proper to submit to the jury the question of the defendant's guilt of any particular grade of offense included in the indictment must be answered by considering whether there is evidence which would justify a conviction for that offense. In this case there was evidence that tended to show that the defendant shot Baldwin because Baldwin cursed him and then attempted to draw a pistol upon him in a threatening manner. The presiding judge may have concluded that if the jury believed this evidence they should acquit, and therefore that this evidence did not justify an instruction in reference to manslaughter. But the jury may have accepted a part of this evidence as true and rejected other portions of it as untrue. They may have concluded that the defendant shot under the belief that he was about to be assaulted, but that he acted too hastily and without due care, and was therefore not justified in taking life under the circumstances. It is not always necessary to show that the killing was done in the heat of passion, to reduce the crime to manslaughter; for, where the killing was done because the slayer believes that he is

in great danger, but the facts do not warrant such belief, it may be murder or manslaughter, according to the circumstances, even though there be no passion. Or, when the slayer, though acting in self-defense, was not himself free from blame, the crime may be only manslaughter. *Wallace v. United States,* 162 U. S. 466. The mere fact that a man believes that he is in great and immediate danger of life or great bodily harm does not of itself justify him in taking life. There must be some grounds for such belief, or the law will not excuse him for taking the life of another. But if the slayer acts from an honest belief that it is necessary to protect himself, and not from malice or revenge, even though he formed such conclusion hastily and without due care, and when the facts did not justify it, still under such a case, although such a belief on his part will not fully justify him, it may go in mitigation of the crime, and reduce the homicide from murder to manslaughter. *Stevenson v. United States,* 162 U. S. 313.

This case is not like the case of *Vance* v. *State,* 70 Ark. 272, where no overt act on the part of the deceased was shown, and where the only provocation given was by words only, which of themselves are not sufficient to reduce an unlawful homicide from murder to manslaughter. Besides, the jury in that case convicted the defendant of murder in the first degree, which went still further to show that manslaughter was not in that case an element to be considered by this court. As there was in this case at least some evidence from which the jury might have concluded that the defendant was guilty of voluntary manslaughter, we are of the opinion that the defendant had the right to have that question presented to the jury.

But the fact that an instruction on the law of manslaughter would have been proper in this case does not call for a reversal unless the defendant asked a proper instruction in reference thereto. There being little evidence to support that view, the circuit court in his discretion concluded not to refer to that degree of homicide in his statement of the law to the jury, so, whether he erred in refusing to give such instruction turns on the question whether the instruction asked by the defendant was a proper instruction under the facts of this case. The instruction which we have set out in the statement of facts is rather long

and somewhat involved, being, no doubt, drawn by counsel during the hurry of the trial. A reference to it will show that the provocation which this instruction makes sufficient to reduce the crime to manslaughter is, to quote its language, one that "provoked a passion irresistible in the disposition of Allison," or, to' quote from it again, one apparently sufficient "to make a killing irresistible in the mind of the defendant." Now, under this instruction, the jury might have concluded that the mere refusal of the conductor to give Allison a cash receipt, or mere words used by the conductor to Allison, were sufficient to provoke an irresistible passion in the mind of Allison. Indeed, the evidence tended very strongly to show that the passion of Allison was brought about entirely by the fact that the conductor refused to let them ride without paying the 21 cents fare required by the company between Dermott and McGehee, and the failure of the conductor to promptly give him a receipt for such fare. The jury might well have found that, on account of the exceedingly irritable disposition of Allison, he could not resist a passion provoked by such conduct of Baldwin. But a passion provoked by such trivial acts as the refusal to give him a cash fare receipt or by abusive words only is not sufficient to reduce an unlawful homicide to manslaughter. The provocation must be such as will ordinarily arouse the passions of men, and such as is calculated to throw them off their guard and cause them to do rash deeds. The question what is a sufficient provocation is, says Mr. Bishop, a question of law, but, like other questions of law, it is found practically involved in inquiries concerning facts, and as such it must be passed upon by the jury. Bishop, Crim. Law (4th Ed.), § 735.

But, because it must be submitted to the jury, it does not follow that the questions of law, as well as of fact, should be turned over to them for decision. Like other questions of fact, it should be submitted under proper instructions in regard to the law. While this instruction closes by telling the jury that to reduce the crime to manslaughter they must find the killing was done in the heat of passion without malice, deliberation or premeditation, yet, taking the whole instruction together, we are of the opinion that it was misleading, for it practically tells the jury that any kind of provocation that was calculated to arouse

and did arouse an irresistible passion in the breast of Allison was sufficient. Under the facts of this case, where the evidence tended strongly to show that there was no provocation except a refusal on the part of the conductor to let Allison ride free, and a little delay in giving him a cash fare receipt for such fare, it was very important that the jury should be told that such facts were no justification for passion, and that, if Allison suffered his passions to get beyond control for no other reason than that, he was guilty of murder.

There is nothing in this case to show any act sufficient to justify an irresistible provocation of which the statute speaks in defining manslaughter except the testimony on the part of the defendant that Baldwin cursed him and undertook to draw a pistol on him. If the defendant had asked the court to instruct the jury that if they believed that the conductor cursed Allison, and undertook to draw a pistol on him, and that, acting under a passion caused by such acts of the conductor, and not in malice, Allison fired the fatal shot, then, even though they believed that the act was not justifiable, they should convict of voluntary manslaughter only; or, if he had asked him to instruct that if under such circumstances Allison shot, not in a heat of passion, but because he in good faith believed that he was in immediate danger of an assault with a deadly weapon, then, even though the jury believe that he acted too hastily and without due care, yet, if there was no malice, they should convict him of manslaughter, and not of murder; the court, we think should have given such an instruction, and a refusal to give it would have been error. But, for the reasons stated, we are not able to say he erred in refusing to give the instructions asked; for, while under some state of facts it might be proper, yet under the evidence here it seems to us that it would have been obviously misleading. We have not gone into a discussion of the facts farther than was necessary to determine the questions of law raised by the appeal, but we will say in conclusion that the evidence makes out a very convincing case against the defendant. The only attempt in justifying or excusing this homicide on the part of Allison was the testimony of himself and the negro, Lee Judson, to the effect that the conductor at the time Allison shot him was attempting to shoot Allison. But this theory of

an assault by the conductor on Allison was directly contradicted by every disinterested witness present at the tragedy except this negro who was with Allison on that night. Three disinterested witnesses, who saw the shooting, testified that Baldwin said nothing to Allison calculated to arouse the anger or resentment of any reasonable man, that Baldwin had nothing in his hands except a receipt book and a pear which he was eating, and that he was making no demonstration towards the defendant at the time he was shot. The testimony of these witnesses is corroborated by a witness who came in and saw Baldwin immediately after he was shot, and who said that he lay on the floor dead with the receipt book and partly eaten pear still in his hand. It is true that a small derringer pistol was found in his inside vest pocket, but the vest was buttoned, and showed that he had made no attempt to draw this pistol. Besides, the defendant and the negro witness who testified that Baldwin was in the act of drawing a pistol say that he was pulling it from his trousers pocket. No such pistol was found or accounted for.

The evidence in this case seems to us sufficient to sustain a verdict even of murder in the first degree, and we think that the able counsel for the defendant secured from the jury all the clemency to which he was entitled. The evidence fully supports the verdict, and, finding no prejudicial error, the judgment is affirmed.

BATTLE and McCULLOCH, JJ., concurred.

HILL, C. J., (concurring.) Counsel for appellant have presented numerous questions which they insist, severally and collectively, call for a reversal. On all the questions presented the court is unanimously for an affirmance except one, and that one, which is chiefly relied upon by counsel, has given the court anxious consideration, and this question alone will be discussed in this opinion.

The appellant was indicted for murder in the first degree, and the court gave to the jury on his trial correct instructions on murder in the first degree, murder in the second degree and justifiable homicide, but did not instruct upon either voluntary or involuntary manslaughter. The appellant asked an instruction on voluntary manslaughter, which the court declined to give.

Judge RIDDICK's opinion considers the sufficiency of the instruction requested, but this opinion will not deal with it, but will assume that the instruction was correct, or rather that a request was made to charge on voluntary manslaughter, and that request denied.

I think the judgment should be affirmed for two reasons: First, the court should not have instructed on voluntary manslaughter, and it would have been error to have done so; and, second, if it be conceded that an instruction on voluntary manslaughter should have been given, yet it was not prejudicial in this case.

1.   The evidence adduced on behalf of the State established murder beyond question, and really murder in the first degree, although there was enough evidence to justify and require an instruction for murder in the second degree. The least probative force which can be given to the State's evidence is that it establishes murder in the second degree beyond a reasonable doubt; and it was ample to have justified and sustained a verdict in either degree.

The evidence of the defendant was as follows: After detailing the facts leading up to the tragedy, which briefly were: He was foreman of an extra gang in railroad work and got on the train of which deceased was conductor at Dermott to go to McGehee. He took one of his negro employees, Lee Judson, with him on the train. He told the conductor his business, and that of his employee, and asked to be permitted to ride without paying. The conductor said he ought to have  a  pass,  and demanded the fare of him and Judson, which was paid. He asked for a cash fare receipt. The conductor told him he did not have his receipts with him, that his porter had them, and he would give them to him later. The conductor then went forward to another car, and the appellant testified: "I said to Massingale: 'I believe I will go up and get my cash fare receipt from the conductor,' and followed the conductor back to the front coach on to the end of the car, and when I got on the other, and he was in the negro car collecting some fares, and I walked up and set down on the end of a seat like this, and put both hands on the railing this way, and sat down in front of

him, and waited until he got through collecting his fares, and I said, 'Captain, I would like to have those cash fare receipts,' just that way, and he said, 'I have been bothered with you enough,' and I said, 'No, you haven't,' and he said, 'I put you out of the negro coach once before tonight,' and I said, 'No, you haven't,' and he said, 'You are a God-damned liar!' and I said, 'You are another one!' When he called me a God-damned liar, he started down in his pocket after his gun, and I said, 'Whoap! that don't go' and when I seen that he had his gun, coming up with it, I knew he was going to shoot me, and I jerked my gun out, and pulled the trigger, and had no idea of hitting him, but just shot to save my life. I did not kill him because he called me a God-damned liar, but because he attempted to draw his pistol. I am certain that the conductor had his pistol in his hip pocket. I saw it coming out in his hand. He had his lantern on his left arm. I did not see Mr. McGehee at any time. He started down after his gun, and I said, 'Whoap! that don't go!' and I jerked my gun out and fired. I had my gun in the scabbard on the inside of my shirt. My shirt opened in front. He got his gun half way out of his pocket. I saw half of it."

The negro employee, Judson, gave testimony corroborating, in part, the above-given testimony of Allison. Otherwise, all the testimony tended to prove murder. But the defendant was clearly entitled to have presented to the jury the law governing the evidence introduced in his behalf, and that evidence, if believed, by the jury, entitled the appellant to acquittal on the ground of justifiable homicide. It does not, in my opinion, present any facts rendering him guilty of manslaughter, voluntary or involuntary, and the State's evidence presented no feature of manslaughter. It is true that the indictment necessarily included the charge of manslaughter, and it is true that the jury had the power to find him guilty of manslaughter. The jury may accept part of one story and reject the balance, and part of the other story and reject the balance, finding the truth between them. Sometimes there is evidence on opposite sides which, dovetailed, will present a grade of crime between the two extremes, and in such cases the judges should charge on every phase presented by the evidence, or which could be directly inferred from it. Such a case was presented recently in *Kinman* v. *State, 73*

Ark. 126, and the same thought is found in *Flynn* v. *State,* 43 Ark. 289. This case is far from falling within this category. There is no evidence on behalf of the defense which is reconcilable with any evidence on part of the State. The opposing sides present irreconcilable, direct and positive contradiction on every word and action. Therefore, the question is baldly presented, when the State's evidence makes out a case of murder, and the defense a case of self-defense, shall the circuit judges instruct the jury on the crime of manslaughter, merely because it is contained in legal effect in the indictment, and because the jury have power to find the defendant guilty of this crime?

In *Allen* v. *State,* 37 Ark. 435, the defendant was indicted for murder by poisoning, and the jury convicted her of murder in the second degree. Chief Justice ENGLISH, considering the absurdity of such a verdict, said that there was no relief from it in the courts except by appropriate instructions to prevent it; that power to render such verdicts was in the hands of the jury.

In *Fagg* v. *State,* 50 Ark. 506, the court, through Chief Justice COCKRILL, said: "It is contended by appellant that the evidence adduced at the trial leads to but one of two conclusions, that is, that the killing was murder in the first degree or justifiable homicide, and, therefore, that the jury could not legally return a verdict of manslaughter. Conceding the premises to be correct, the conclusion does not follow. Where the evidence and the instructions demand a verdict of murder, there is no alternative but to sentence the prisoner accordingly. * * * The courts can only instruct juries as to their duty, giving to them the law applicable to the facts, and no other. If there is no evidence whatever tending to establish a lower grade of homicide than murder in one instance, or voluntary manslaughter in another, the court should decline to give the jury directions as to any lower grade of homicide (*Benton* v. *State,* 30 Ark. 328; *Allen* v. *State, supra*), and it is the jury's duty to take the court's exposition of the law as that applicable to the case. But the court cannot direct a verdict for the higher offense, nor restrain the jury from returning it for the lower grade."

In *Smith* v. *State,* 50 Ark. 545; this court said: "The court has no discretion to withhold instructions appropriate to any

theory of the case sustained by competent evidence." In *Jones*
v. *State,* 52 Ark. 345 the court said: "The trial court should in
no case indicate an opinion as to what the facts establish; but
in properly giving the *law* the court must of necessity determine
whether there is *any evidence at all* justifying a particular
instruction." *Curtis* v. *State,* 36 Ark. 284, is very similar to the
last-quoted statement.

In Missouri the same rule as stated in the Jones case is
thus elaborated: "The court is the judge of the grade of the
homicide the evidence tends to prove, and should only instruct
on the law governing these grades. The jury is to determine
which grade, if any, the evidence establishes." *State* v. *Turling-
ton,* 102 Mo. 642. To the same effect *State* v. *Punshon,* 124 Mo.
448. In *State* v. *McGuire,* 113 Mo. 670, the facts disclosed either
a wanton and malicious assault to kill, or a perfect right of self-
defense against a brutal and unprovoked attack, and it was held
that it was proper to refuse an instruction on the lower grade.
In *State* v. *Doyle,* 107 Mo. 36, the defendant did not deny
the intentional shooting, but alleged self-defense, and it was
held that the trial court properly refused to instruct on a grade
lower than the one charged in the indictment.

In *Glenn* v. *State,* 71 Ark. 86, the trial court instructed on
involuntary manslaughter, and this court said: "It was wrong to
instruct on involuntary manslaughter, as there was no evidence of
involuntary manslaughter in the case. Acting upon this instruc-
tion, the jury found the defendant guilty of involuntary man-
slaughter, and gave him six months in the penitentiary, while in
our opinion the proof strongly tends to show he was guilty of
voluntary manslaughter. But, notwithstanding, the judgment
must be affirmed. The practice of giving instructions upon
degrees of crime when there is no evidence to warrant such instruc-
tions is calculated to mislead the jury and work prejudice. It
should be avoided." The trial judge in this case was following
this recent admonition from this court to refrain from instructing
upon a degree of crime when there was no evidence, and did right
in refusing to instruct on manslaughter. It was, as shown by
authority, the duty of the court to see if there was any evidence
in the record to establish manslaughter, and, finding none, he
properly instructed on those grades upon which there was evi-

dence, and on justifiable homicide, and no other. This is the approved criminal practice, not only in Arkansas, but generally. 1 Bishop, Cr. Proc. § 980; 2 Bishop. Cr. Proc. § 638a.

2. If it be conceded that an instruction for manslaughter should have been given, still it is not prejudicial error in this case. Correct instructions were given on the degrees of murder and on justifiable homicide. Assuming there was evidence justifying an instruction on manslaughter, it would have been predicated upon a state of facts which comes here discredited by the jury. The jury has said he was guilty of murder in the second degree, and has assessed his punishment at ten years in the penitentiary. This is five years more than the minimum punishment for that grade of murder, and is three years more than the maximum punishment for manslaughter.

If there is evidence in this record authorizing manslaughter, it has not impressed the jury, for it has given the defendant three years more than a conviction for that crime will sustain. It was said in argument that if such an instruction had been given, it would have given the jury greater latitude, and might have produced a lesser verdict, had the jury known they could consider manslaughter. But the jury had latitude from the death penalty to acquittal, and as the jury viewed the case as one calling for severer punishment than the law of manslaughter authorized, it cannot be seen where there has been prejudice to appellant in not having that law submitted to them. *Farris* v. *State,* 54 Ark. 4, was very similar to the case at bar; in fact, indistinguishable in principle and with few differences in salient facts. For these reasons the court refused to reverse a conviction for murder in the second degree where the court held there was sufficient evidence of manslaughter to have made it error to refuse to instruct upon it, and yet held it not prejudicial error.

In *Bittick* v. *State,* 67 Ark. 131, errors in instructions and argument as to self-defense were held not prejudicial where the jury found defendant guilty of manslaughter, rendering the consideration of self-defense unnecessary. Following and approving these authorities necessarily leads to the conclusion that, if there was error in failing to instruct on manslaughter, it was not prejudical.

Mr. Justice Wood concurs in so much of this opinion as holds that the failure to instruct on manslaughter was not prejudicial.