## PICKETT v. STATE.

## Opinion delivered October 4, 1909.

1.  HOMICIDE—DUTY TO INSTRUCT AS TO MANSLAUGHTER.—Where, in a prosecution for murder, there was testimony justifying a finding that the defendants killed deceased under the belief that it was necessary to save their own lives, but that they were negligent in forming such belief, it was error not to instruct the jury as to voluntary manslaughter.  (Page 574.)

2.  SAME—JUSTIFICATION.—Where the defendant in a murder case seeks to justify the killing as in self-defense, it was error to instruct the jury that the guilt or innocence of the defendants depended upon the existence of reasonable grounds of belief that they were in danger, regardless of how the danger appeared to them at the time. (Page 575.)

3.  INSTRUCTION—CREDIBILITY OF WITNESS.—It was not error to instruct the jury that if they believed a witness had sworn falsely in part and truth in part they should reject that part which they believed to be false and accept that part which they believed to be true.  (Page 576.)

Appeal from Union Circuit Court; *George W. Hays,* Judge; reversed.

*Thornton & Thornton,* for appellants.

1.  This case falls within the exception to the rule against disturbing the verdict of a jury.  Even where there is a conflict in the evidence, this court will direct a new trial, where the verdict is so clearly and palpably against the weight of it as to shock the sense of justice.  34 Ark. 639.  The verdict against Wilson Pickett inflicting the highest punishment is conclusive evidence that the jury were swayed by prejudice or passion.  The evidence does not connect him with the crime.  As to Henry Pickett, it is clear that he was being attacked in his own home, his castle, which Bunk Abbott and the deceased were entering in a violent and tumultuous manner, and which, under the circumstances, he had the right to defend, even to the taking of human life.  While there is some conflict as to whether or not Bunk Abbott fired first, there is no question that Charles Abbott, for whose death these appellants are on trial, was the aggressor from the beginning of his connection with the difficulty.

2.  Appellants were entitled to an instruction on the question of manslaughter, and the court's failure to so instruct when requested was error.  74 Ark. 265; 69 Ark. 139.

3. The oral instruction given by the court charging the jury that, if they believe any witness had sworn falsely in the case, it was their duty to disregard the testimony of such witness, etc., was erroneous. It does not even require that the matter falsely sworn to be material. 68 Ark. 336.

4. The fourth instruction given at plaintiff's request is perhaps correct when applied to ordinary cases of self-defense, but a different rule applies where one is in his own home, defending himself against attack.

*Hal L. Norwood,* Attorney General, and *C. A. Cunningham,* Assistant, for appellee.

1. Under the evidence the defendants were guilty of murder either in the first or second degree, or guilty of no offense at all. The trial court should not instruct as to the law of a particular grade of homicide when there is no evidence to connect the defendant with it. 88 Ark. 448; 36 Ark. 285; 52 Ark. 345.

2. If the fourth instruction had been the only one given on the right of self-defense, it might have misled the jury. It is rather loosely drawn, but in view of the facts developed in evidence defendants were not prejudiced thereby. Taking all of the instructions together, they gave the law of the case, and appellant's defense was fully presented, and the jury's verdict will not be set aside if one of the instructions was misleading. 21 Ark. 357; 59 Ark. 322; 37 Ark. 238; 58 Ark. 353; 77 Ark. 141; *Id.* 100; 59 Ark. 558.

3. The court's oral charge correctly stated the law, and left it to the jury to reject that part of a witness' testimony which they believed to be false and to accept that part which they believed to be true.

4. The evidence is sufficient to sustain the verdict as to both appellants, and it should stand. 47 Ark. 196; 50 Ark. 511; 76 Ark. 326.

HART, J. The appellants, Henry Pickett and Wilson Pickett, were indicted in the Calhoun Circuit Court for murder in the first degree, committed by killing Charles Abbott, and on change of venue to Union County they were tried and convicted of murder in the second degree. Their sentence was fixed at a period of 21 years in the State Penitentiary. An appeal has been duly prosecuted to this court.

The evidence on the part of the State is correctly abstracted by the Attorney General as follows: On the 8th day of December, 1908, Henry Pickett went to the store of Bunk Abbott, and told him that he had a bale of cotton at the gin for him. Bunk Abbott told Henry Pickett that it was all right; that he would go down there and get the cotton. And Abbott asked Pickett what did he do with the seed, and when Pickett replied that the seed were at ' the house Abbott told him that he owed him the cotton and seed, and then it would not pay his account. Bunk Abbott told his brother, the deceased, Charlie Abbott, to go down and tag the cotton. Henry Pickett, Charley Abbott and Wilson Pickett, a brother of Henry Pickett, left the store together. Bunk Abbott knew the reputation of the two negroes, and when he saw Wilson Pickett leave with them, he went down to where they were to load the cotton. After the cotton was loaded, the two Pickett negroes went to the house. In a very short time a conversation took place between Henry Pickett, who was sitting at the time on the porch at his house, and Bunk Abbott, who was at or near the gate.

According to the testimony of Bunk Abbott and Hard Green, a negro boy who was there at the time, Bunk Abbott told Henry Pickett to go down and unload the cotton. Henry said he was not going. Bunk told him they would have to have a settlement. He told Bunk to go off, that he did not want to talk with a drunk man. Bunk asked him if he thought he was drunk, and he told him that he had his account, and put his hands in his pocket to get the account. Henry replied, "To hell with you," and immediately stepped into the house, and came back, and commenced shooting. Bunk and Charlie Abbott then approached the house, and also began firing. Hard Green saw Wilson Pickett in the house during the shooting, and Ira Newton, who was about 100 yards away, testified that he saw "the darkey" at the corner of the room at the "L" of the house run into the house immediately after he had heard some shots. A little bit later Newton saw both negroes come from around the house. One was carrying a single-barreled shotgun, and the other a rifle. As they passed Newton, they were asked if any one got hurt. Henry said that he was shot in the leg, and Wilson said "they come and got our cotton."

The negroes fled the country, and were finally captured at Monroe, La.

Bunk Abbott was shot in the arm and in the chin. The shot struck the back of his arm near the wrist bone, and came out on the inside of his arm, near the elbow. Charlie Abbott was shot in the left arm, and a load of squirrel shot penetrated his breast over the heart. There were forty-four squirrel shot holes in his breast covering a space of about six inches.

The circumstances in regard to the killing, as testified to by the defendant Henry Pickett, is as follows: "I am one of the defendants. We had been to town that day, and did not have any dinner, and I was hungry, and I went in the kitchen, and asked my wife how near supper was ready, and she replied that it would be ready in a few moments, and I went back and sat down on the porch, and Mr. Abbott says: "Henry, come out here and get in this wagon, and go back to town with me.' I said: 'Mr. Abbott, you have plenty of help without me.' He says: "Damn that! This is your cotton, and I want you to go back to town and unload it. I started to tell him something, and he said again: 'Come out here.' I started to go out there, and then concluded I had better stay where I was, and said to him that I had better stay where I was, as he did not look right. He says: "You damned son of a bitch, come out of there!" And I told him I was not coming, and he said: 'If you don't come out of there, I am coming in there.' He said: 'You may think I have no right to come in there, but I will show you.' I said: 'I have got nothing to say about that.' He then pulled his gun out and started in. He got about half way between the gate and the doorsteps where I was sitting. I was still sitting there, and he had the gun in his hand. I did not think he was going to shoot me, and I just stayed there. I stayed there until he stepped up to me, and when he gets up to me he says: 'By God, you get up and come out of here.' I sat there just a second, and then I gets up and whirls right quick in the house. He then shoots at me three or four times, may be five, and then he started in the house. Mr. Bunk was running in this way shooting, and Mr. Charlie was shooting this way (indicating). My children and my wife were scared nearly to death. My children was running around after me hallooing and screaming. And they were just shooting every way.

My wife had been cleaning up and scrubbing that day. I ran to the corner where I generally kept my gun, and I did not find it, and I ran to the bed and found my gun where they had put it while they were cleaning up. I grabbed my gun, and began shooting at them. I did not have but one shell, and I shot it, and then I ran back and got my rifle, and began shooting at them. I shot both the shotgun and rifle. My brother did not shoot at all. He had nothing to do with the difficulty. I did not have any pistol that day; never owned one in my life. After the shooting I ran out of the back door and into the field where we saw Mr. Porter. We then went off into Louisiana. My family consists of a wife and three children. The oldest is 14 years, the middle one two years, and the youngest 10 months old. They were all in the house running around, scared to death. The reason I did not go back to town with the wagon was that my wife's mother was about to die."

The testimony of Wilson Pickett is substantially the same as that of Henry Pickett.

Counsel for appellant correctly contends that the court erred in refusing to instruct the jury on voluntary manslaughter. The facts in the present case bring it squarely within the principle announced in the case of *Allison* v. *State,* 74 Ark. 444. Mr. Justice RIDDICK, speaking for the court said:

"In each case, then, the question of whether it is proper to submit to the jury the question of the defendant's guilt of any particular grade of offense included in the indictment must be answered by considering whether there is evidence which would justify a conviction for that offense. In this case there was evidence that tended to show that the defendant shot Baldwin because Baldwin cursed him and then attempted to draw a pistol upon him in a threatening manner. The presiding judge may have concluded that if the jury believed this evidence they should acquit, and that therefore this evidence did not justify an instruction in reference to manslaughter. But the jury may have accepted a part of this evidence as true and rejected other portions of it as untrue. They may have concluded that the defendant shot under the belief that he was about to be assaulted, but that he acted too hastily and without due care, and was therefore not justified in taking life under the circumstances. It is not

always necessary to show that the killing was done in the heat of passion to reduce the crime to manslaughter; for, where the killing was done because the slayer believes that he is in great danger, but the facts do not warrant such belief, it may be murder or manslaughter, according to the circumstances, even though there be no passion. Or, when the slayer, though acting in self-defense, was not himself free from blame, the crime may be only manslaughter. *Wallace* v. *United States,* 162 U. S. 466. The mere fact that a man believes that he is in great and immediate danger of life or great bodily harm does not of itself justify him in taking life. There must be some grounds for such belief, or the law will not excuse him for taking the life of another. But if the slayer acts from an honest belief that it was necessary to protect himself, and not from malice or revenge, even though he formed such conclusions hastily and without due care, and when the facts did not justify it, still under such a case, although such a belief on his part will not fully justify him, it may go in mitigation of the crime and reduce the homicide to manslaughter. *Stevenson* v. *United States,* 162 U. S. 313.

So in the present case the jury, exercising its right to accept such portions of the testimony as it believed to be true and to reject that believed to be false, might have found that there was not only provocation by words, but that there was an overt act on the part of deceased and his brother. In short, the jury might have found that the defendants shot first, but that they did so under the belief, formed too hastily and negligently, that Bunk Abbott was reaching for his pistol when in reality he was only coming in for the purpose of having a settlement with the defendants. As there was at least some substantial evidence upon which the jury might have found the defendants guilty of voluntary manslaughter, the defendants had a right to an instruction on that question.

Inasmuch as there must be a reversal on account of the failure to instruct on manslaughter, we shall take occasion to caution the court in regard to the form of instruction No. 4. To say the least of it, the instruction was ambiguous. It might be construed to make the guilt or innocence of the defendants dependent upon the existence of reasonable grounds of belief that they were in danger, regardless of how the danger appeared

to them. *Burton* v. *State*, 85 Ark. 48; *Hoard* v. *State*, 80 Ark. 87; *Magness* v. *State*, 67 Ark. 599; *Smith* v. *State*, 59 Ark. 132.

Counsel for appellants also insist that the oral instruction given in regard to the credibility of witnesses was erroneous because it warranted the jury in disregarding testimony which it believed to be true if it came from a witness whom the jury believed had sworn falsely to some other material fact. While the instruction might have been couched in clearer language, we do not think it susceptible of that construction. It, in effect, told the jury that, if they believed a witness had sworn falsely in part and truthfully in part, they should reject that portion which they believed to be false and accept that part they believed to be true. It is, therefore, not in conflict with the rule announced in the case of *Bloom* v. *State*, 68 Ark. 336, and of *Frazier* v. *State*, 56 Ark. 242.

Counsel for appellants next contend that there is no evidence connecting Wilson Picket with the killing. We cannot agree with their contention in this respect. There was evidence tending to show that both defendants were in the house during the time of the shooting, and that two guns were used. Both the defendants left immediately after the shooting, each carrying a gun.

For the error in refusing to instruct the jury on manslaughter, the judgment is reversed, and the cause remanded for a new trial.