JOHNNIE GILCHRIST *v.* STATE OF ARKANSAS

5212                                                        409 S. W. 2d 329

Opinion delivered December 5, 1966
[Rehearing denied January 9, 1967.]

*Harry C. Robinson,* for appellant.

*Bruce Bennett,* Attorney General; *Fletcher Jackson,* Asst. Atty. General, for appellee.

GUY AMSLER, Justice. Appellant, Johnnie Gilchrist, was tried in the Circuit Court of Pulaski County, on a charge of murder in the first degree and convicted of murder in the second degree. The jury fixed his punishment at 21 years imprisonment in the State Penitentiary. Motion for a new trial was overruled and appeal was perfected in due time. The only point relied on is that ''The court erred in refusing to charge the jury on the lesser offense of manslaughter.''

The background facts as reflected by the proof may be briefly stated. Sometime during the early morning of August 21, 1965 (the exact time is uncertain because of conflicts in the evidence) appellant Johnnie Gilchrist and his brother Walter got into a ''ruckus'' at their mother's home on Raines Road outside the city limits of Little Rock. They were ''quieted down'' by other members of the family. Later the brothers went their separate ways on different missions and returned to their mother's around 9:00 a.m. During their absence from home Johnnie procured a pistol someplace and fetched it home with him. Johnnie was in the home of his sister and Walter (the deceased) was at his mother's house. The houses are some 100 to 150 feet apart. Walter had returned to his home with a nephew Leon Farr. When he entered the house his sister, Alice Gilchrist, warned him not to go out the back ''door because Johnnie said he was going to kill him,'' but that he went anyway. She said Walter did not have a gun, and Leon Farr said he saw no gun.

There was no eye witness to the shooting other than appellant and his version is somewhat different. His testimony was that he told his niece that he was going to take the pistol back to his nephew's and when about to leave he saw Walter out in the back yard with a .22 rifle, and that his brother, the deceased, told him to come on out he (Walter) ''was going to kill me.'' He

says that he then went back and told his niece (not corroborated by her) "that fool was standing out there with a gun," and while he talked with his niece a few minutes, "I figured he'd go and put it up," and then:

"Q. Okay. Now, what happened when you went out, or did you go out the door then?

A. Yes, I went out the back door.

Q. Okay, then what happened?

A. When I came out, I shot him, That's all I know what happened.

Q. How many shells did you fire?

A. Twice.

Q. You fired twice?

A. Yes, sir.

Q. How many times did your brother fire?

A. He didn't get a chance to fire. Not then he didn't. He had already shot before then, before I went in the house talking to her.

Q. How many times did he shoot?

A. He didn't shoot but one time.

Q. And you say he told you to come out of the house, that he was going to kill you?

A. That's right.

Q. And when you came out the door you had your mind made up that you were going to protect yourself?

A. That's right."

He further testified that "I felt like if I would shoot him in the leg or something to make him drop that

gun.'' Appellant then left and reported to the officers that he had shot his brother. He also delivered the pistol to the deputy sheriffs and they found four spent cartridges in it. He never reported to the officers that his brother had a gun at the time he shot the deceased.

The instructions which appellant contends should have been given read:

"Manslaughter is the unlawful killing of a human being without malice, express or implied, and without deliberation.

"Manslaughter must be voluntary upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible. That is voluntary manslaughter."

Three cases are cited in support of appellant's argument. *Collins v. State,* 102 Ark. 180, 143 S. W. 1075, may be distinguished on the facts. Collins and Jones were riding by Yarbrough's (the deceased) home in a buggy, at night, when one of them fired a pistol (apparently into the air). Yarbrough came from his house toward the buggy, with gun in hand and ordered the occupants of the buggy to halt. Both sides started firing and Yarbrough was killed. Collins was indicted for and convicted of murder. The trial court refused to instruct on voluntary manslaughter and we held this to be error. Justice Frauenthal wrote:

"Both Jones and the defendant were surprised by the appearance of the deceased near the buggy and by his attack made with gun in hand, and, not knowing who he was, they feared either that they would be robbed by him or receive injury to their persons from him; and that by reason of this fear and surprise Jones fired at the deceased. This, in short, is the testimony of the defendant himself, which though contradicted in many material points by other evidence in the case, nevertheless presented

an issue which, under the law, he had a right to have submitted to and be determined by the jury upon proper instructions. It appears that the court instructed the jury relative to murder in the first and second degrees, but did not instruct them at all in reference to the crime of manslaughter or the punishment for that degree of homicide, although requested to do so by the defendant. The grade of a homicide may be reduced from murder to manslaughter by reason of a passion caused by a provocation apparently sufficient to make the passion irresistible. The passion may consist of anger or fear or terror. These are the causes from which the passion springs; and, whether induced by the one or other of these causes, it will reduce the grade of the homicide from murder to manslaughter. It is perfectly proper to show that in a given case the passion did exist for the reason that it was induced by anger suddenly aroused, or by surprise, or by fear, or by terror; and where there is any evidence tending to show that the defendant was guilty of a lower grade of homicide than murder, the trial judge should instruct the jury in reference thereto when requested by the defendant.''

In the instant case we have a distinctly different set of facts. Appellant was not confronted with a ''surprise'' situation which might be calculated to create a sudden heat of passion, fear or terror. He seemingly was in a perfectly safe place—his sister's home. His conversation with his niece (which, according to the proof, may have lasted some 15 or more minutes) indicates neither fear nor terror and his act of deliberately walking out the back door into the very ''mouth of the cannon'' so to speak, does not indicate any great measure of fear on his part. If his brother, gun in hand, (as he says) was standing in the adjoining back yard some 50 to 100 feet away threatening to kill him his (appellant's) conduct (under his own testimony) may best be categorized as poor judgment or willfully intentional rather than charged to a sudden heat of pas-

sion, fear, surprise or terror. We do not consider the Collins case beneficial to appellant's contention.

*Pickett* v. *State,* 91 Ark. 570, 121 S. W. 732, is relied on. Henry and Wilson Pickett were indicted on charges of first degree murder for killing Charles Abbott and were convicted of second degree murder. The court refused an instruction on voluntary manslaughter and this was held to be error.

On the 8th day of December, 1908, Henry Pickett went to the store of Bunk Abbott and reported that he (Pickett) had a bale of cotton at the gin for which he wanted credit on his store account. Abbott told Pickett that he (Abbott) "would go down there and get the cotton." That evening about supper time Pickett was sitting on his front porch when Charles and Bunk Abbott drove up in a wagon. Justice Hart narrates Pickett's version of what happened:

"and Mr. Abbott says: 'Henry, come out here and get in this wagon, and go back to town with me.' I said: 'Mr. Abbott, you have plenty of help without me.' He says: 'Damn that! This is your cotton, and I want you to go back to town and unload it.' I started to tell him something, and he said again: 'Come out here.' I started to go out there, and then concluded I had better stay where I was, and said to him that I had better stay where I was, as he did not look right. He says: 'You damned son of a bitch, come out of there!' And I told him I was not coming, and he said: 'If you don't come out of there, I am coming in there.' He said: 'You may think I have no right to come in there, but I will show you.' I said: 'I have got nothing to say about that.' He then pulled his gun out and started in. He got about half way between the gate and the doorsteps where I was sitting. I was still sitting there, and he had the gun in his hand. I did not think he was going to shoot me, and I just stayed there. I stayed there until he stepped up to me, and

when he gets up to me he says: 'By God, you get up and come out of here.' I sat there just a second and then I gets up and whirls right quick in the house. He then shoots at me three or four times, maybe five, and then he started in the house. Mr. Bunk was running in this way shooting, and Mr. Charlie was shooting this way (indicating). My children was running around after me hallooing and screaming. And they were just shooting every way. . . . I ran to the corner where I generally kept my gun, and I did not find it, and I ran to the bed and found my gun where they had put it while they were cleaning up. I grabbed my gun, and began shooting at them. I did not have but one shell, and I shot it, and then I ran back and got my rifle. My brother did not shoot at all. He had nothing to do with the difficulty. I did not have any pistol that day; never owned one in my life. After the shooting I ran out of the back door and into the field where we saw Mr. Porter.''

The third case offered by appellant as supporting his position is *Ringer* v. *State,* 74 Ark. 262, 85 S. W. 410. Ringer owned a country store in Yell County. On Christmas Day several persons gathered at the store for a ''turkey shoot.'' York McCullom and his son John were there and John had an air gun. A shot from the air gun entered the store and when Ringer went out the front door to warn the boys he and John got into a fight. John cut Ringer in the back with a knife and chased him back into the store. Ringer thinking the boy was still in pursuit grabbed his Winchester rifle, wheeled and fired from the back of the store. York McCullom who was in the store during the altercation had started to walk out the door. Ringer's bullet struck him in the back and he died. Ringer was indicted and tried for the killing. The testimony was in conflict as to whether the homicide was intentional or an accident.

The trial court refused an instruction on ''involuntary'' manslaughter and we held this to be error.

568

It is readily apparent that neither of the foregoing cases presents such factual pictures as confronted the trial court in the instant prosecution. We think that they are distinguishable on either the facts or the law, if not both.

We have numerous cases holding that it is not error for the trial court to refuse an instruction on "lesser degrees" of an offense when the evidence does not justify doing so. *McGarrah* v. *State,* 217 Ark. 186, 229 S. W. 2d 665; *Washington* v. *State,* 181 Ark. 1011, 28 S. W. 2d 1055; *Allison* v. *State,* 74 Ark. 444, 86 S. W. 409.

Having concluded that the record reflects no proof that would require an instruction on voluntary manslaughter and no other error being urged the case is affirmed.