## NICHOLS v. STATE.

### Opinion delivered February 5, 1912.

1. VENUE—CHANGE OF—SECOND APPLICATION—DISCRETION OF COURT.—It was not error to refuse to entertain a second petition for change of venue in a criminal case until the first application had been acted upon. (Page 270.)

2. SAME—SECOND APPLICATION—WHEN PROPERLY DENIED.—Where a petition for change of venue in a criminal cause was denied on account of the insufficiency of the supporting affidavits, a petition subsequently filed which did not show that defendant was surprised by the testimony offered in support of the original application was properly denied. (Page 271.)

3. SAME—WHEN PROPERLY DENIED.—Where a petition for change of venue in a criminal cause was denied on account of the insufficiency of both of the supporting affidavits, a showing by defendant that he was surprised at the testimony of one of the supporting witnesses will not help him on a second application, as the statute requires the oath of two credible persons. (Page 271.)

4. SAME—WHEN PROPERLY DENIED.—Where a petition for change of venue in a criminal cause was denied because of the insufficiency of the supporting affidavits, refusal to permit a second application to be made was not an abuse of discretion where defendant failed promptly to announce his surprise at the testimony of his supporting witnesses. (Page 271.)

5. SAME—SUFFICIENCY OF EVIDENCE.—Evidence that a homicide took place in a certain township in the county is sufficient proof of the venue. (Page 271.)

6. HOMICIDE—EVIDENCE OF RELATIONS WITH DECEASED.—Where, in a prosecution of defendant for killing his wife, it appeared that they had been separated for nine months, and defendant was permitted to testify as to his wife's conduct while they lived together, and her feelings toward their children, it was not error to exclude his testimony as to the cause of the separation. (Page 272.)

7. SAME—PROVOCATION.—Where, in a prosecution of one for killing his wife, it appeared that they had been separated for many months, it was not error to instruct the jury that the previous conduct of the parties and their unpleasant relations did not reduce the crime to manslaughter or mitigate the crime. (Page 273.)

8. SAME—DUTY TO INSTRUCT AS TO MANSLAUGHTER.—It was not error to refuse to instruct as to manslaughter where there was no testimony tending to reduce the crime to that degree. (Page 274.)

Appeal from Jefferson Circuit Court; *Antonio B. Grace,* Judge; affirmed.

*Appellant, pros se.*

1. The court erred in overruling appellant's petition for change of venue. Kirby's Digest, § 2318; 98 Ark. 139; 54 Ark. 243.

2. It was error to exclude evidence offered by appellant to show the conduct of the deceased and appellant towards each other prior and up to the time of the killing. 21 Cyc. 894-f; 62 Ark. 119; 52 Ark. 303; 21 Cyc. 912; Wharton on Homicide 895; 137 Ala. 1; 24 Ky. Law Rep. 1174; 66 S. C. 419; 42 Tex. Cr. Rep. 269; 108 Tenn. 282; 124 Ga. 31.

3. The court in its instruction No. 20 erred in limiting the evidence of former difficulties between the parties to determining thereby who the aggressor was at the time of the killing. The jury had the right to consider all these facts and circumstances which evidently led up to the killing, in determining whether or not appellant was aroused and killed deceased upon a sudden impulse, and therefore was guilty of some lower degree of homicide than murder in the first degree.

4. Where there is any evidence tending to show a lower degree of homicide than murder in the first degree, it is the duty of the court to give instructions covering such lower degree. 74 Ark. 262; 52 Ark. 45; 50 Ark. 545.

*Hal L. Norwood,* Attorney General, and *William H. Rector,* Assistant, for appellee.

1. There was no error nor any abuse of discretion in overruling the petition for change of venue and the amended petitions. 95 Ark. 239, and cases there cited; 86 Ark. 357.

2. The testimony as to the conduct of the parties towards one another previous to the homicide was probably admissible as tending to show malice, ground for ill-will and hatred, and a motive on the part of appellant for the killing, and certainly

appellant has no ground to complain that part of it was excluded. It would not go to show provocation. 93 Ark. 409; 70 Ark. 272; 75 Ark. 142.

3. Appellant's own testimony excludes any idea of manslaughter, and the court correctly refused to instruct on that degree of homicide.

4. Venue may be proved by a propponderance of the testimony. 62 Ark. 497.

McCULLOCH, C. J. Appellant, W. T. Nichols, was indicted by the grand jury of Jefferson County for the crime of murder in the first degree, and his trial resulted in a conviction of that degree of homicide. He killed his wife. They were married in the year 1902, and in 1908 went to live near the house of appellant's father in Jefferson County, Arkansas. They lived there until December, 1910, when they separated, and lived apart thereafter. Appellant continued to live with his father, which was a few miles out in the country from Pine Bluff. The deceased lived in the city of Pine Bluff. They had three children—two girls under eight years old and a boy two or three years old— which, after the separation, remained with appellant. Divorce proceedings were pending, and the court made an order directing that deceased be permitted to have the children two days in each week. She went out to the home of appellant's father several times, and got the children, appellant being absent from home each time except the last, when the killing occurred. On September 16, 1911, deceased went out in a buggy to get the children, and was accompanied by a Mrs. Parnell, an acquaintance, who thus became a witness to the tragedy. When they got to the place, about 9 o'clock in the morning—that is, to the home of appellant's father—one of the little girls first came out, and then appellant, who took the child in his arms and came to the gate. He and deceased talked to each other for awhile in a friendly way, and deceased asked for the keys to the house across the road where they had formerly lived. He went into his father's house and got the keys, and proposed to go to the house with her. They went into the house where they had formerly lived, the two girls accompanying them and, according to the testimony of Mrs. Parnell, remained in the house about an hour, she (witness) remaining seated in the buggy out in the road in front of the

houses. When they came back, deceased walked to the buggy where Mrs. Parnell was seated, and asked appellant, "Willie, boy, are the children ready?" and he told her to "come and see." Deceased went up to the gate and stood there waiting for the children. In a few minutes the two girls came out, and appellant sat down on the front porch with the boy in his lap. Deceased called to the boy, asking him to come to her, but they couldn't get him to come. Deceased then walked to the porch and was begging the child to come to her, having in her hand at the time a cap which she had brought the child, and was begging him to come get it, when appellant arose, put the child down on the floor, walked down the steps, and grabbed deceased by the throat and appeared to be choking her. She staggered and fell down, and then got up, and was seen to be bloody. The appellant had cut her throat, as he admitted on the witness stand. She ran out the gate, the blood streaming from her, and soon thereafter died from the effects of the wound. Nothing unfriendly occurerd between the couple on that occasion, and no harsh words were spoken except that appellant says, while they were in the house together, she spoke cross to him. So far as the testimony shows, there was nothing harsh occurred between them until appellant walked down the steps to commit the awful deed, and even then there was nothing to show that his wife was doing anything to him to arouse, or to aggravate, his anger. This is Mrs. Parnell's account of the tragedy. Appellant's account of the affair, as detailed on the witness stand, does not differ materially from Mrs. Parnell's narrative, except as to just what occurred the moment before the killing. He testified as follows:

"I sat down there in a chair, and finally she came in right up close to the gallery floor, and I was sitting there near the edge of the floor, and when she walked in, the child threw its head right down (indicating) like that in between the arm of the chair and my knee and its feet or body lying down between my knees with his face next to me, and was holding to me and crying to keep from going, and she walked up, but I asked her to let them alone and not take them away. I says, 'Myrtle is going to school; let them alone and come after them on Friday next, in order not to take her away from school.' She said, 'That didn't make any difference—two or three days out of

school didn't make any difference;' and she walked up and tried to prevail on the child to come, and he would not do it; he would not look at her, and she got hold of his feet, and pulled him out of my lap, and on the impulse of the moment. it flew all over me that she had expressed herself that she wished her children were all dead and delivered, and coming in that manner to take them away from me caused me to rise to the height of anger to defend the child. I felt that I was the only one to defend it. When she pulled the child out of my lap, I stepped down the steps and plumb around her. I just throwed my arms around her neck, and I cut her throat. We fell down. I was weak, and we both fell, and she was lying on the ground when I cut her throat, we were both lying on the ground, kind of sideways.' On cross examination, he stated that, as soon as she got hold of the child, he made up his mind to kill her, and at once walked down from the porch and grabbed her. He admitted that she didn't speak a cross word to him or attempt any violence toward him. In other parts of his testimony, he related some of their domestic troubles, and said that she had frequently expressed a lack of affection for the children and expressed the wish that they were dead.

The first assignment of error is as to the ruling of the court in denying a petition for a change of venue. Appellant filed his petition in due form with two supporting witnesses. Those witnesses were examined orally, and, after hearing them testify, the court decided that they were not credible persons, and denied the prayer of the petition. Neither of the witnesses showed, on examination, sufficient knowledge or information on the subject to warrant them in making the affidavit, and the court did not err in its conclusion that they were not credible persons. The petition for change of venue was filed and the witnesses examined on October 11, 1911. The court took the matter under advisement and rendered its decision thereon October 17. In the meantime, on October 13, appellant presented another petition for change of venue, with two other supporting witnesses. He therein stated, on oath, that he was surprised at the testimony of one of the supporting witnesses to the former petition. The court refused to permit the petition to be filed on the ground that the former petition was still pending. After the court made the ruling on October 17,

denying the change of venue, appellant filed a third petition, supported by the same witnesses as in the second petition, but omitting the statement contained in the second petition to the effect that appellant had been surprised at the testimony of one of the witnesses to the first petition. The court also overruled this, and appellant excepted. There are several sufficient reasons, we think, why it can not be said that the court erred in denying the last petition for change of venue. The trial judge was not in error in refusing to entertain another petition until he was ready to decide the first one, which he then had under advisement. When he announced his decision, appellant did not rest on the second petition, alleging surprise at the testimony of one of the witnesses, but filed a third petition omitting that allegation, and this amounted to an abandonment of the second petition, and brought the case clearly within the rule announced in *Duckworth* v. *State*, 86 Ark. 357.

Another reason why we can not hold that the court abused its discretion is that appellant only alleged, in his second petition, that he was surprised at the testimony of one of the supporting witnesses. As neither of the witnesses showed, on oral examination, sufficient information on the subject to warrant them in making the affidavit, even if appellant was surprised at the testimony of one of them (witness Harper), it would not have helped his cause if that witness had testified as he expected, for the statute requires the oath of two credible persons.

Another reason why we should not disturb the court's exercise of discretion in this matter is that appellant failed to promptly announce his surprise at the testimony of witness Harper, and the court might have concluded that the desire to present the second petition was a mere afterthought because the first effort resulted in failure. The question of allowing a defendant to present successive petitions for change of venue is one of discretion with the trial court, and the exercise of that discretion ought not to be disturbed unless it appears to have been improvidently exercised. *Duckworth* v. *State, supra.*

It is next contended that the venue was not sufficiently proved. The venue in a criminal case is an essential fact, and must be proved as alleged, but it need only be proved by a preponderance of the testimony (*Wilson* v. *State*, 62 Ark. 497),

and may be proved by circumstances. *Bloom* v. *State*, 68 Ark. 336; *Cage* v. *State*, 73 Ark. 484; *Douglass* v. *State*, 91 Ark. 492. Some of the witnesses described the farm house near which the killing occurred, and one witness stated that the place described was in Nivens Township, Jefferson County. *Smith* v. *State*, 90 Ark. 438. The court and jury took notice of the location of Nivens Township, and thus knew that it was not situated on the borders of Jefferson County. *St. Louis, I. M. & S. Ry. Co.* v. *State*, 68 Ark. 561.

During the progress of appellant's examination as a witness, he was permitted without objection to make statements as to his wife's conduct while they lived together, and afterwards toward him and toward their children. He stated that his wife had no affection for the children, and even expressed the wish that they were dead. He proved the same thing by his father, who testified in the case. Appellant was asked by his counsel to state why he and his wife separated—whose was the fault—and the court, of its own motion, excluded the question and answer, ruling at the time that the private relations between appellant and deceased during their married life, and the state of their feelings during that time, were not material. It was not competent to prove the unpleasant relations between him and deceased while they lived together, for it was too remote to have any bearing on the conduct of the parties at the time of the killing, so far as they tended to establish the guilt or innocence of appellant. They had been separated for nine months, and had had, so far as the records disclose no communication with each other since the separation. Nor is it conceivable, in the light of the undisputed evidence in this case, how the testimony could help appellant's cause or how he, was prejudiced by its exclusion. The court, however, subsequently let appellant prove his and deceased's conduct toward each other, and gave an instruction limiting its consideration to the purpose of showing which of the parties was the aggressor at the time of the killing. That instruction was objected to by appellant, and it reads as follows

"20. No previous difficulties, offensive language, quarrels or unpleasant domestic relations between the parties can be considered as furnishing that extreme degree of provocation which the law regards as necessary to arouse an irresistible

passion and reduce the killing to manslaughter. Evidence as to the previous language and conduct of the deceased can only be considered by you in connection with her actions at the time of the killing, in order to enable you to determine which of the parties was the aggressor if all the other evidence in the case leaves you in doubt on that question. Nor is such evidence received and to be considered in mitigation of a crime. If you are satisfied by the evidence, beyond a reasonable doubt that the defendant killed Minnie Nichols, and that such killing was willful—that is, that the act of killing was intentional; that is not justifiable or excusable as being done in necessary self-defense; that it was felonious—that is, done with an intent to commit an act which is made a felony by law; that it was done with malice as hereinbefore defined, and that it was done after premeditation and deliberation, that is, thinking about it be-forehand for any period of time, however short, and resolving to take the life of the deceased, then defendant was guilty of murder in the first degree, and the previous unpleasant relations of the parties can not be considered in justification or mitigation of the offense."

The instruction was correct in telling the jury that the previous conduct of, and the unpleasant relations between, the parties did not furnish provocation for the killing, that it did not reduce the degree of homicide to manslaughter, and did not mitigate the crime. It was unnecessary to include the other part of the instruction, for there is no evidence that there was any difficulty between the parties at the time of the killing or that deceased was the aggressor. The undisputed evidence shows that deceased committed no hostile act toward appellant. and that she was merely trying to take the children, which she had the right to do under the orders of the court, and which appellant consented for her to do. That part of the instruction did not, however, prejudice appellant's rights in any wise. Appellant asked for instructions on manslaughter, but we are of the opinion that the court was correct in refusing them. In no view of the testimony could appellant's crime be reduced to manslaughter. There is nothing in his own testimony which frees him from the charge of murder, and the most that can be said of it, if entirely believed, is that it leaves some doubt whether there was deliberation and premeditation so as to con-

stitute murder in the first degree. Without provocation sufficient even to reduce the degree of the crime, he killed his unoffending wife, and the only excuse he offers is that he acted on a sudden impulse, caused by her attempt to take with force the unwilling child. Professor Wharton lays down the rule, which is no doubt correct, that "homicide committed in passion, excited by inadequate provocation is murder in the second degree, and not manslaughter," but that "the provocation must be judged by the *res gestae,* and the evidence must be confined to the facts and circumstances surrounding and preceding the killing." Wharton on Homicide, § 168. Of course, this statement of the law must be taken with the qualification that, "in order to reduce the crime to murder in the second degree, the killing must be done in a sudden heat of passion, and not after deliberation." That is doubtless what was meant by the learned author in his statement of the law.

The court gave correct instructions on the two degrees of murder, among other things telling the jury that "if the killing be unlawful, felonious and with malice, but done upon a sudden impulse and not as the result of an intention to kill previously formed in the mind of the slayer after deliberation and premeditation, then it is murder in the second degree."

The evidence in the case fully warranted the jury in finding that there was no provocation whatever for the killing, and that it was done after deliberation and with premeditation, so as to amount to murder in the first degree. The judgment will therefore be affirmed, and it is so ordered.