ARNOLD *v.* STATE.

Opinion delivered September 23, 1929.

*Fred A. Isgrig, Walter A. Isgrig* and *Scipio A. Jones*, for appellant.

*Hal L. Norwood,* Attorney General, and *Pat Mehaffy,* Assistant, for appellee.

SMITH, J.   In the small hours of the morning Leon Gary was called to the door of his home, in the city of Little Rock, and shot three times, through the wire screen of the door, and, when he fell, his assailant entered the room and shot him twice more.

A sergeant of the police force, who was on duty at the police station, testified that he received a call at 2:30 A. M., advising him of the shooting, and Gary was carried to the city hospital where he died at 7 that morning. Before dying he made a statement, in which he said that he was fully aware of his impending death, and that ap-

pellant, Byron Arnold, had shot him, and that he had fully recognized Arnold as his assassin.

A nephew of the deceased, and a sister-in-law, who both resided at the same house, testified that they too recognized Arnold as the man who had done the shooting. Other testimony in the case leaves little room to doubt that Arnold shot and killed Gary.

Arnold was a member of an orchestra, of which James Bryant was the leader, and they appear to have been intimate friends. These men, as well as the deceased, were colored. Arnold and Bryant went to a cafe to get some food, some time after midnight, and there is a conflict in the testimony as to whether they were accompanied there by a young colored woman named Annie May Cannon. At any rate, they were with this woman at the cafe, and a controversy arose over the conduct of Arnold and Gary in her presence, which resulted in a fight, during the course of which Arnold was cut several times with a knife. He testified that he received a wound in his throat, one on his body, which was only prevented from being serious by the protection which a belt afforded, and another in his right hand. This latter appears to have been the most serious of them all, although each wound was dressed after Arnold had been carried to the hospital and the attendance of a surgeon had been secured, after some delay. The testimony is conflicting as to who was the aggressor in the fight at the cafe. Arnold also had a knife in this fight, but did not use it with any effect.

Arnold was carried to a hospital in an ambulance, and was escorted there by the Cannon woman, and was followed by Bryant, who went in an automobile. Arnold requested Bryant to return the Cannon woman to her home, and she was finally induced to go, but, when they came near her home, she demanded that she be returned to the hospital, and this demand was .complied with. When they returned to the hospital Arnold asked Bryant to again take the woman home, as he feared his wife

would come to the hospital and see her, and the woman was again carried away. After leaving the woman, Bryant drove to Arnold's home, where Arnold was returned in the ambulance, and was met by the members of his household, including his mother.

The testimony on the part of the State is to the effect that Arnold was in a towering rage from the time he was cut until after he had shot Gary, and that he said to the surgeon who dressed his wounds that he would have another patient before day. Bryant was asked by Arnold's mother, after arriving at Arnold's home, to restrain Arnold and prevent him from killing Gary. Arnold went to the 'phone and called the home of Gary, and told Gary it was Bryant speaking. When Bryant asked Arnold why he had done this, Arnold stated that he wanted to know if Gary was at home. This incident increased the apprehensions of the persons present, and they insisted that Arnold go to bed, but he took his pistol out of the house, saying he was going to hide his gun. When he returned he was told to wash the blood off his hands and face, and his wife began to heat some water for this purpose. Arnold went to bed, but, before the water was hot, left his bed and ran out of his room. Arnold's wife called out to Bryant that Arnold had gone, and she and Bryant followed him. A man named McCoy, who was also at the house, went to his car to overtake Arnold, but found that the car key was not in the car. Bryant and Arnold's wife followed Arnold, but did not overtake him, and, when they came near Gary's home, which was about eight blocks away, they heard three shots in rapid succession, and, after a short interval, two more. They met Arnold returning from the direction of Gary's home, and Bryant testified that Arnold said he had killed Gary. He further testified that he and Arnold's wife accompanied Arnold home, and, after arriving there, a hurried conference was held, in which it was agreed that all of those present would say that Arnold went to bed after returning from the hospital, and had not again left home that night.

When put upon trial for killing Gary, Arnold sought to prove an alibi, and all the persons at his home that night, except Bryant, testified that Arnold did not leave his home after returning from the hospital. The police arrested Bryant in connection with their investigation of the killing, and he, too, stated, at the time of his arrest, that Arnold did not leave home that night. Upon his examination as a witness at the trial Bryant admitted that he had made this statement, and that he had made other statements which he then admitted were false. He was asked by the prosecuting attorney if he had given the same testimony before the grand jury as he was then giving before the trial jury, and, when he answered that he had, counsel for Arnold demanded the right to examine the minutes of the grand jury, in order that they might determine whether this statement was true. This request was denied, and an exception was saved to that ruling.

No error was committed in this ruling. The statute (§§ 2980 and 2981, C. & M. Digest) requires that every grand jury appoint one of its members to be the clerk thereof, whose duty it is to preserve and keep minutes of their proceedings and of the evidence given before them, and to deliver these minutes to the prosecuting attorney when so directed by the grand jury. The testimony given by the witness before the grand jury was, of course, immaterial, and the trial court would, no doubt, have ordered it stricken from the record had this been asked, but the request made was that these minutes be submitted to counsel for defendant for their inspection.

This is a right which has never been accorded to persons accused on trial in this State.

Professor Wharton, in his work on Criminal Evidence, § 564a, page 1157, says that the general rule is that an accused in a criminal case has no right to an inspection of the minutes of the grand jury, either before or during the trial.

In the case of *State of Ohio* v. *Rhodes*, 81 Ohio State 397, 91 N. E. 186, this question was well considered by

the Supreme Court of Ohio, and the conclusion reached that a person charged with a crime had no such right, and that it was error for the trial court to order the State's attorney to deliver minutes of the grand jury, or a transcript of the evidence so taken, to the defendant, or his attorney, for inspection. The notes to this case, which is annotated in 27 L. R. A. (N. S.) 558, show, as stated by Professor·Wharton, that this is the general rule.

The Cannon woman was subpoenaed as a witness by the State, but was not called in that behalf, but she was called as a witness for the defense, and, in the course of her examination, she was interrogated concerning conversations she had had with Bryant as they journeyed to and from the hospital. It was sought by these questions to contradict the testimony of Bryant, who had testified on his cross-examination that he did not have a pistol, and that he did not make any threats against the deceased. Had she been permitted so to do, she would have testified "that Bryant told the witness, while at the hospital, and before the deceased was shot, that he had an automatic gun at the time, and was going to shoot the deceased."

It is insisted that this testimony was competent, both to impeach the testimony of Bryant and to support the defense of an alibi, by showing that a person other than the defendant had both the means and the intention to commit the crime with which the accused was charged.

We think no error was committed in the exclusion of this testimony. Except for this offer, there was no attempt to show that Bryant had killed Gary, and the testimony, if admitted, would not have tended to show any bias or prejudice on the part of Bryant against Arnold. It would have had the opposite effect, of showing that Bryant was Arnold's partisan and that he resented the treatment which Arnold had received at the hands of the deceased.

Cases are cited to the effect that, where one is charged with a crime, and evidence of a circumstantial nature is offered tending to show his guilt, it is competent to prove that a third person had made threats that he would commit the same crime. It may be answered, however, that the evidence in this case is not circumstantial in its nature. On the contrary, it is as positive as testimony can be, that Arnold killed Gary, and there was no attempt to show, except the proof above referred to, that Bryant committed the crime.

In the case of *McElroy* v. *State,* 100 Ark. 312, 140 S. W. 8, it was stated:

"As a general rule, in a case where the guilt of the defendant is shown by evidence which is largely circumstantial in its nature, any testimony tending to show that some other person may have committed the crime is admissible. But, where nothing else appears connecting third persons with the commission of the crime, threats made by them against a deceased are inadmissible. Before such threats made by third persons can be introduced in evidence, facts and circumstances must be adduced connecting or tending to connect such persons with the crime itself" (Citing authorities).

The examination of Bryant by appellant's counsel was therefore upon a collateral matter, and his answers, whether true or false, concluded the inquiry upon that subject. *Williams* v. *State,* 175 Ark. 752, 2 S. W. (2d) 36; *Bacquie* v. *State,* 171 Ark. 589, 285 S. W. 18; *Perkins* v. *State,* 168 Ark. 710, 271 S. W. 326; *Jordan* v. *State,* 165 Ark. 502, 265 S. W. 71; *McAlister* v. *State,* 99 Ark. 604, 139 S. W. 684.

At the conclusion of all the testimony, counsel for defendant requested the court to charge the jury that defendant was either guilty of murder in the first degree or was not guilty of any crime, and an exception was saved to the action of the court in charging upon murder in the second degree. If an error at all, this was one of which the defendant could not complain, as he was not

prejudiced thereby. *McGough* v. *State,* 113 Ark. 301, 167 S. W. 857; *Roberts* v. *State,* 96 Ark. 58, 131 S. W. 60.

After the court had charged the jury as to the law concerning murder in the second degree, counsel for defendant then asked the court to give an instruction which was in the language of the statute upon the subject of voluntary manslaughter. The court refused to give this instruction, and this ruling presents what we regard as the most important question in the case.

It is earnestly argued that, while defendant denied that he had killed deceased, and devoted all the testimony in his behalf to an attempt to establish an alibi, the jury might, while disregarding this testimony, have found that, although defendant had killed deceased, he had done so upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible.

It is true, of course, that, having been indicted for murder in the first degree, the indictment includes all the lesser degrees of homicide. It is true also that the defendant is entitled to have the law declared as to any defense which the testimony presents, either to the effect that he is not guilty at all or that he is guilty only of one of the lesser degrees charged in the indictment, and he is not to be deprived of this right because this defense was made to appear from testimony which was contradictory of the testimony offered in his own behalf. *Phares* v. *State,* 155 Ark. 75, 243 S. W. 1061; *Smith* v. *State,* 150 Ark. 193, 233 S. W. 1081; *Dewein* v. *State,* 114 Ark. 472, 170 S. W. 582; *King* v. *State,* 117 Ark. 82, 173 S. W. 852; *Collins* v. *State,* 102 Ark. 185, 143 S. W. 1075; *Allison* v. *State,* 74 Ark. 453, 86 S. W. 409; *Pickett* v. *State,* 91 Ark. 570, 121 S. W. 732.

But it is also true that, unless there is such testimony, whether offered by the defendant or appearing in testimony contradicting that which he did offer, which is legally sufficient to support the defense upon which the instruction is asked, there is no error in refusing the

request; in other words, while the trial court may not pass upon the veracity of witnesses, the court may say, as a matter of law, whether testimony, when given its highest probative value, with the inferences legally deducible therefrom, is sufficient to sustain the defense interposed, or to say, as in this case, whether such testimony, if true, suffices to lower the grade of the crime charged. The following cases, among others, are in point upon this question: *Robinson* v. *State,* 177 Ark. 538, 7 S. W. (2d) 6; *Clark* v. *State,* 169 Ark. 729, 276 S. W. 840; *Rogers* v. *State,* 136 Ark. 161, 206 S. W. 152; *King* v. *State,* 117 Ark. 82, 206 S. W. 152; *Nichols* v. *State,* 102 Ark. 266, 143 S. W. 1071; *Jones* v. *State,* 102 Ark. 195, 143 S. W. 907; *Bradshaw* v. *State,* 95 Ark. 409, 129 S. W. 811; *Dow* v. *State,* 77 Ark. 464, 92 S. W. 28; *Allison* v. *State,* 74 Ark. 453, 86 S. W. 409; *Ringer* v. *State,* 74 Ark. 262, 85 S. W. 410; *Vance* v. *State,* 70 Ark. 272, 68 S. W. 37; *Jones* v. *State,* 52 Ark. 345, 12 S. W. 704; *Curtis* v. *State,* 36 Ark. 284; *Benton* v. *State,* 30 Ark. 328.

In the latest of these cases, that of *Robinson* v. *State,* 177 Ark. 538, 7 S. W. (2d) 5, we said, in quoting from the case of *Clark* v. *State, supra,* that "if there is no evidence to establish a lower degree of homicide than murder in the first degree, the court, in properly giving the law, must of necessity determine whether there is any evidence at all to justify a particular instruction, and it is the duty of the jury to take the court's exposition of the law" (Citing authorities).

It becomes necessary therefore to determine, as a matter of law, whether there was any testimony sufficient to support a finding that the crime committed was that of voluntary manslaughter, and in the decision of this question we recognize the rule that any reasonable doubt about the facts should be resolved in favor of the accused, and that he should be given the benefit of any reasonable doubt arising out of the testimony as to the degree of his crime. Section 3183, C. & M. Digest.

The circumstances herein detailed are such as to apparently show a deliberate and malicious killing, and

to fully support the finding of the jury that appellant is guilty of the crime of which he was convicted, that of murder in the second degree, upon which he was given a sentence of eighteen years in the penitentiary, or even of the highest degree of homicide known to the law, that of murder in the first degree.

But was there testimony sufficient to support a finding that the killing was upon a sudden heat of passion apparently sufficient to make the passion irresistible? The answer to this question depends upon a consideration of what is known in the law of homicide as cooling time.

*Allison* v. *State*, 74 Ark. 444, 86 S. W. 409, has become a leading case in this State, at least, upon this subject, and it was there said by Mr. Justice RIDDICK that: "The provocation must be such as will ordinarily arouse the passions of men, and such as is calculated to throw them off their guard and cause them to do rash deeds. The question, what is a sufficient provocation, is, says Mr. Bishop, a question of law, but, like other questions of law, it is found practically involved in inquiries concerning facts, and as such it must be passed upon by the jury. Bishop, Crim. Law (4th ed.) § 735."

In volume 1 of Russell on Crimes (8th ed.), page 666, it is said:

"In every case of homicide upon provocation, however great the provocation may have been, if there has been sufficient time for passion to subside and reason to interpose, such homicide will be murder. * * * 'For let it be observed that, in all possible cases, deliberate homicide upon a principle of revenge is murder. No man under the protection of the law is to be the avenger of his own wrongs. If they are of a nature for which the laws of society will give him an adequate remedy, thither he ought to resort; but be they of what nature soever, he ought to bear his lot with patience, and remember that vengeance belongeth only to the Most High.' "

In Bishop on Criminal Law, vol. 2 (9th ed.), page 543, it is said:

"Cooling time.—If the passion had time to cool, the offense is not reduced to the lower degree, though in fact it had not cooled. For 'when anger, provoked by a cause sufficient to mitigate an instantaneous homicide, has been continued beyond the time which, in view of all the circumstances of the case, may be deemed reasonable, the evidence is found of that depraved spirit in which malice resides.' "

Continuing, at the same page the learned author says:

"We have no rule for determining how much time is necessary for cooling; in the nature of things, it must depend much on the particular case. Commonly the time in which an ordinary man under like circumstances would cool is the criterion. * * *"

In support of this statement of the law, our case of *Fitzpatrick* v. *State,* 37 Ark. 238, is cited. At § 718 of the same text, page 546, it is further said:

"Blood actually cool.—Says Hawkins: 'Whenever it appears from the whole circumstances of the case that he who kills another on a sudden quarrel was master of his temper at the time, he is guilty of murder; as, if, after the quarrel, he fall into other discourse, and talk calmly thereon; or perhaps if he have so much consideration as to say that the place wherein the quarrel happens is not convenient for fighting, or that, if he should fight at present, he should have the disadvantage by reason of his shoes,' etc. In other words, if the actual furor of mind does not exist, or does not impel the fatal blow, there is no excuse to reduce the homicide to manslaughter."

In McClain on Criminal Law, vol. 1, § 343, it is said:

"The preceding discussion has shown that homicide under provocation is reduced to manslaughter on account of the heat of passion thereby engendered, which, out of charity to the weakness of human nature, is assumed to deprive the killing of that malignant character which would otherwise be supposed to exist and to constitute

malice aforethought. And it has also appeared that the provocation must be such as would have influenced a reasonable person, and that the killing must be the result of passion. Therefore if such time has elapsed after the provocation as that a reasonable person would have regained self-control, then the act must be deemed malicious, and not the result of the provocation, and therefore murder. In other words, if there has been sufficient time for the passion to cool, the provocation will not mitigate a subsequent killing to manslaughter. The question is not whether the blow was actually struck in a continuance of the passion, but whether there had been a reasonable time for the passion to cool in the case of an ordinary person, or whether the defendant did actually commit the homicide in cold blood. This must depend on the circumstances of the case, and is a question for the jury.''

In the application of these principles, which the Allison and other cases from this court have followed, we have concluded that the court did not err in refusing to charge upon the subject of voluntary manslaughter.

The testimony is somewhat indefinite as to the length of time which intervened between the first quarrel and the killing, but we think it fair to say that as much as two hours had intervened. Within this time, according to the testimony which tends to present this issue, the defendant had deliberated upon the manner in which he would take Gary's life, and had thought out and executed the ruse of ascertaining whether Gary was at home by falsely stating that another person had called on the telephone; and, immediately after the killing had occurred, he had joined with others in the preparation of a simulated defense by which he might avoid the consequences of his act. This testimony also shows that, when the Cannon woman returned to the hospital, defendant contemplated the probable consequences of the discovery of her presence there by his wife, and he contrived to have her sent away to avoid a meeting between

these women. He had also carried his pistol from the house and had hid it, so that his intention to kill might not be circumvented.

Cases on the subject of cooling time recognize the principle that the character of the provocation should be taken into account in determining whether or not there had, in fact, been cooling time. There are certain provocations which would superinduce a greater and more irresistible passion than others; and, while defendant did have a great provocation, he also had, what we think the jury must necessarily have found, a time long enough for the passion to sufficiently cool for him to regain possession of himself and of his reasoning faculties, and we think the circumstances detailed show conclusively that he had done so.

Defendant denied that he had made any threats against the deceased, and on that subject testified that: "I was a little angry, but not angry enough to kill him"; and, when asked if he had cooled down, he said "I was a little sore, but not dead angry with him." He denied having threatened to kill deceased, or that he had any such intention, or that he had said he would have Gary in the hospital within an hour after he left there, although he admitted that the matter was not a closed incident.

Undoubtedly defendant was greatly angered, but anger alone does not suffice to reduce malicious killing to voluntary manslaughter. If this were true, many of the most deliberate killings would be reduced to that grade. There must be a sudden heat of passion aroused by a provocation apparently sufficient to make the passion irresistible, and, even when such a passion has arisen, the degree of homicide is not reduced if there has been time within which a reasonable and ordinary man would have cooled, or reflected, even though he had not cooled.

We think the undisputed testimony shows that such time had elapsed; that defendant had time for reflection, and had reflected, but his reflection was upon the manner

in which he might appease his wrath, and it is conduct such as this which raises malicious killing to the grade of murder in the first degree.

There are certain other assignments of error which we have considered, but do not regard as of sufficient importance to require discussion.

Upon a consideration of the whole case we have concluded that there was not sufficient testimony to require the submission of the question whether defendant was guilty of voluntary manslaughter; and, as no error appears in the record, the judgment must be affirmed, and it is so ordered.