Porter R. RODGERS Sr. *v.* STATE of Arkansas

CR 76-156                    547 S.W. 2d 419

Opinion delivered March 14, 1977
(In Banc)

*Ed Bethune*, for appellant.

*Jim Guy Tucker*, Atty. Gen., by: *Gary Isbell*, Asst. Atty. Gen., for appellee.

HARRY F. BARNES, Special Judge. On the night of September 25, 1974, Fern Rodgers was shot and killed at her home in Searcy. Approximately two weeks later Mrs.

Rodgers' husband, Porter R. Rodgers, Sr., the appellant herein, was charged in her death with capital felony murder. The appellant entered pleas of not guilty and not guilty by reason of insanity.

Both the deceased and the appellant were very prominent, longtime residents of White County. Dr. Rodgers was a seventy year old physician actively engaged in a profitable medical practice in Searcy. He was estranged from his wife and had lived in a local hotel for the five or six months preceding his wife's death. The appellant had served on the State Racing Commission, was actively engaged in a farming enterprise, and was active in the breeding and showing of walking horses.

The State alleged that Peggy Hale, an employee and paramour of Dr. Rodgers, and the appellant had hired one Barry Kimbrell to "rob, rape, and kill" Fern Rodgers. The appellant was tried alone for his alleged part in this conspiracy. After a lengthy jury trial the appellant was convicted of first degree murder and sentenced to life imprisonment. The appellant now brings to this Court eight points on which he relies for reversal.

## I.

Prior to being arrested and charged with his wife's murder, the appellant signed what amounted to a confession, the truth of which he subsequently denied. The appellant here contends that the introduction into evidence of that signed confession violated appellant's rights to counsel and to refrain from incriminating himself.

No question is raised in this appeal relative to the procedures followed by the trial court in determining the admissibility of the confession. Appellant's only argument is that the conduct of the police in obtaining the confession, considered in light of all the other circumstances, was such as to compel exclusion of the confession for the stated reasons.

The facts and circumstances surrounding the confession will now be set forth in some detail. The so-called confession consisted of admissions by the appellant that he had, with the

assistance of Peggy Hale, hired Barry Kimbrell to kill Fern Rodgers. During the course of the police investigation of this crime the appellant was interviewed some five or six times. The confession was the product of the last such interview. To establish the totality of the circumstances surrounding the confession, it is necessary to review that particular interview, as well as the two interviews immediately preceding it.

Peggy Hale was arrested in connection with Mrs. Rodgers' murder at about noon on November 8. Shortly thereafter, the appellant appeared at the White County Courthouse and sought to arrange a bond for her release. Appellant was immediately informed by the police that he was a suspect in the murder of his wife. Appellant was given a *Miranda* warning and promptly signed a written waiver of those rights. Appellant had also been given *Miranda* warnings on two prior occasions. This conversation between the appellant and the officers was electronically recorded. It contained no statements which would tend to incriminate the appellant. During the course of the interview, the appellant told the officers that he wanted to talk to his lawyer before he made any definite statement relative to his wife's death. The transcript of the interview reveals that one of the police officers told the appellant that he had, indeed, better spend some of his money on a good lawyer. The interview was terminated without further interrogation and without the appellant being arrested. The entire interview lasted approximately one hour.

The next police interview with the appellant occurred during the early morning hours of November 9. Prior to that interview the police investigators had obtained statements from both Hale and Kimbrell which implicated them, together with the appellant, in the murder of Mrs. Rodgers.

The appellant was asked by the police if he would agree to come to the prosecuting attorney's office for the purpose of discussing some new developments in the case. The appellant agreed. A police car went to the appellant's hotel and transported him to the prosecuting attorney's office. This occurred at approximately 3:00 A. M. the morning of November 9.

Upon arriving, the appellant was informed by Officer W. A. Tudor that he was a suspect in the capital felony murder investigation of his wife's death. The appellant was again informed of his rights, specifically that he had the right to remain silent and the right to have an attorney present during the interview. At 3:21 A. M. the appellant signed a written waiver of these rights. Dr. Rodgers was then confronted with statements of Hale and Kimbrell, which had been recorded electronically and transcribed. At the request of the appellant he was also permitted to personally confront Miss Hale, who confirmed to the appellant that she had made the statement to the police.

This second interview with the appellant was also recorded. The appellant made a tacit admission of his involvement in the murder, as well as a specific request for the assistance of an attorney.

I only admit that Peggy Hale has always been truthful with me and I do not deny that what she said in the tape recording was true but I want to consult with my attorney, Leon Catlett, before I make any further statements.

Miss Hale, who was also present, recalled the appellant stating to the officers that ". . . he would contact his lawyer and get back in touch with them. . ."

The second interview was terminated, again without the appellant being placed in custody or his freedom otherwise restricted. A police officer, James Lester, drove the appellant back to his hotel at approximately 4:45 A.M.

Lester testified that he did not attempt to interrogate the appellant during the trip to the hotel. However, Dr. Rodgers did, according to Lester, state that he had several things on his mind that he wanted to talk to Lester about, but that the appellant did not feel like talking then. Lester stated that he would be glad to talk to the appellant and they agreed to meet at noon that day in Room 124 of the Kings Inn Motel. That was the motel where the State Police personnel were staying while in Searcy and Room 124 was the room occupied by Lester.

Dr. Rodgers' confession occurred during his next, or third, interview with the police. While there is substantial conflict between the appellant's and the police version of this interview, several facts related to it are not in dispute. These facts, which are either admitted or uncontradicted, include the following. The appellant met Lester between 12:30 P.M. and 12:45 P.M. on November 9 in Room 124 at the Kings Inn Motel. While there the appellant ordered lunch from the motel room service, which he and Lester ate in the room. The appellant and Lester were alone in Room 124 most of the time. However, three other policemen and a motel waitress were in and out of the room during the afternoon for periods of a few minutes each. Lester and the appellant stayed in Room 124 until 2:45 or 3:00 P.M. They then drove together in Lester's vehicle to the prosecuting attorney's office. Since no one was in the office, Lester requested that another policeman, Doug Stevens, be present during the interview with the appellant. Stevens was present during the entire interview. At about 3:10 P. M. the appellant executed a written waiver of his *Miranda* rights. The appellant then apparently, although he denies any recollection of it, made a statement to Lester which was incorporated in the confession. The appellant then affixed his signature to each page of the confession. The interview was concluded at about 4:40 P.M., whereupon Lester immediately placed the appellant under arrest for the murder of Fern Rodgers.

The appellant's version of the interview contains the following facts which are at odds with the police version. Officer Lester, not the appellant, initiated the interview. Lester first phoned the appellant at about 10:00 A.M. stating that he wanted to talk to the appellant. The appellant readily agreed, but Lester said he was busy then and would have to phone back later. Lester telephoned again about 11:00 A.M. and told the appellant to meet him at the appellant's room in Noble's Motel. The appellant again readily agreed. Lester phoned again a third time at about 11:45 A. M., and, according to the appellant, said, "We'll meet at the motel." Finally, the appellant testified that Lester called less than ten minutes later and told the appellant to meet him at Room 124 at the Kings Inn.

The appellant describes the interview or interrogation itself in the following terms:

I arrived at Room 124 of the Kings Inn at about 12:30 and Lester let me in. He said he meant business. He showed me his pistol and said, "I hope we don't have to use this pistol but I can sure use it." His face was red. I was afraid of the man and I was tired so I sat down on the bed. He told me, "We are going to bring this thing to a head today." There was no one else in the room but on occasion he would leave the room and go into the adjoining room and talk to someone. Once when he came out of the adjoining room I saw what looked like a whiskey bottle in his hand. I could tell he was mad and he showed me his pistol twice. Stevens and the other man came by the room and talked to Lester. I was in the room over two hours and was hungry so I ordered some food. Lester kept trying to get me to talk and I told him two or three times that I would have to talk with Leon Catlett, my lawyer. He said, "To hell with the damn lawyer. I am tired of hearing that." Around 2:45 we left the Kings Inn. I asked Lester to let me take my car to the County Office Building, but he wouldn't listen to me and told me to get in the car. On the way down to the building, I saw he was mad at me. I told him that I was going to have to have a lawyer before I could make any further statement. Along about that time I began to have one of my weak spells. I don't remember anything else until something was said by Lester about signing. I remember distinctly he made me sign on the bottom and over on the side. So then the next thing I remember, I was walking to the jail. I deny what's in the statement but it is my signature.

The record reveals the following testimony by Officers Lester and/or Stevens contradictory to the Rodgers' version. After dropping the appellant at Noble's Motel at about 4:45 A. M., Lester had no contact with the appellant until 12:30 P.M. At that time the appellant phoned Lester and stated, apparently referring to their 12:00 noon appointment, that he had been delayed and was just leaving to meet Lester. The appellant arrived at Room 124 a few minutes later. Lester and the appellant ate lunch in the room, at the suggestion of

the appellant, and watched a football game on television. Lester was not drinking and the mood of the conversation was always cordial. Lester finally asked the appellant if he was ready to talk to him. The appellant said he was. Lester then asked that the appellant accompany him to the prosecuting attorney's office for a formal interview. The appellant readily agreed. Lester did not interrogate the appellant, or even discuss the case, at any time at the motel or during the ride to the prosecuting attorney's office.

When Lester and the appellant arrived at the prosecuting attorney's office no one was there. Lester summoned Officer Doug Stevens to be present during the interview. Stevens remained with Lester and the appellant until the statement was completed. The appellant expressly confirmed to Stevens that he had been informed of his rights by Lester and had agreed to waive them.

The three men engaged in idle conversation for a few minutes before the appellant stated, "Let's get on with the business." Lester then asked the appellant to tell him what had happened from the beginning, whereupon the appellant related the circumstances of his wife's murder. Lester transcribed this confession in longhand. At its conclusion the statement was given to the appellant, who appeared to read it in its entirety. Stevens then suggested that Lester read it aloud to the appellant. Lester did this and the appellant then signed the statement.

There was no electronic recordation of the conversation at the Kings Inn or the interview at the prosecuting attorney's office. However, as stated, there were four other persons present in Room 124 with Lester and the appellant for various short periods of time. One of these, the motel waitress, was a disinterested witness. The appellant concedes that these witnesses' testimony is without dispute or conflict relative to the following facts: Food was ordered to the room; there was no evidence that Lester was drinking; no one heard the Rodgers' murder case even mentioned; no one heard or observed any indication that Lester threatened or otherwise abused the appellant.

There is also no evidence that Leon Catlett, or any other

attorney, was actually employed by appellant to represent him relative to the police investigation of Mrs. Rodgers' murder. It is undisputed that the appellant did not consult with any attorney during the period of November 8 and 9.

In summary, Dr. Rodgers testified that he was threatened, mistreated, and abused by Officer Lester and that he does not remember making the statements that went into his confession. Lester expressly denies this and claims that the appellant's confession was completely voluntary. In addition, at all times the appellant was alert, responsive, and appeared to fully comprehend what was going on about him. Finally, all other evidence tending to support one of the above conflicting versions over the other is on the side of Officer Lester. In fact, we find not a shred of evidence in the record which tends to corroborate Dr. Rodgers' testimony relative to the third interview and his confession.

At the *Denno* hearing below, both the State and the appellant introduced expert opinion evidence relative to the appellant's mental capacity at the time of the events described above. Dr. Douglas Stevens, a clinical psychologist, testified for the appellant by stipulation that the appellant's waiver of rights signed at 3:10 P. M. on November 9, ". . . Would have been the product of confusion, it would not have been the product of intelligence and understanding." Likewise, Dr. James M. Sims testified that the appellant's waiver, ". . . Would have been the product of confusion."

A psychologist and a psychiatrist, Dr. John Althoff and Dr. Oscar Kozberg, also testified by stipulation for the State. Each gave the opposite opinion from that of the defense experts. The State's witnesses stated that Dr. Rodgers' waiver of his rights was ". . . the product of intelligence and understanding."

We have reviewed the record relative to the confession according to the standard established in *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515 (1974). There we held that the State had the burden of proving by a preponderance of the evidence each element essential to the admissibility of a confession. Further, we stated that this Court on appeal would review the totality of the circumstances surrounding the con-

fession to determine whether the trial court's decision on admissibility was clearly against the preponderance of the evidence. In the instant case, we find each of the following to be established by an overwhelming preponderance of the evidence. The confession was given freely and voluntarily. The appellant knew that he had the right to remain silent and that he had the right to counsel during questioning. The appellant also knew that by requesting counsel he could terminate the questioning. However, the appellant knowingly and intelligently waived his right to remain silent and his right to counsel prior to making his confession. Therefore, the trial court did not err in admitting the appellant's confession into evidence.

As stated, we have applied the standards set forth in *Degler* v. *State, supra,* in reviewing this confession and have held the confession to be admissible under those standards. However, we do not hold that *Degler* is necessarily the correct rule where, as here, the person making the confession was not in custody. Certainly many elements present in a custodial interrogation and confession are absent when the confession is the product of a voluntary interview with the police.

For instance, the appellant argues here that this confession is inadmissible under our rule in *Pierce* v. *State,* 248 Ark. 204, 451 S.W. 2d 219 1970). In other words, once Dr. Rodgers had stated an intention to consult an attorney, the appellant argues that the State was effectively barred from further interrogation until the consultation with an attorney had in fact taken place. We hold that is not the rule in a non-custodial interrogation.

Here, on two prior occasions police interviews were terminated as soon as Dr. Rodgers indicated a desire to consult an attorney. Thereafter, his freedom was not restricted in any manner and the police did not seek to again interview him for several hours. In short, the appellant, after indicating a desire to consult an attorney, was always given an adequate time in which to carry out that desire before he was again asked to submit to an interview. And further, before any such subsequent interview was commenced, Dr. Rodgers was again advised of his rights and willingly signed a written waiver of those rights. Under those circumstances we hold that Dr.

Rodgers' rights received more than adequate protection at the hands of the police.

The appellant's testimony contained allegations of police misconduct which at first glance seem to raise questions related to a coerced confession. As stated above, we believe that the preponderance of all the evidence supports Policeman Lester's version of that third interview. However, we would point out that Dr. Rodgers' version does not, in fact, place the confession within the framework of the classic coerced confession cases. This is for the simple reason that Dr. Rodgers does not attribute his confession to the allegedly coercive behavior of Lester. Rather, the appellant simply denies any recollection of making the statement. In other words, this confession is not alleged to have been made because of fear of police mistreatment. Instead it is alleged that the confession was not the product of a conscious mind and was, therefore, involuntary. However, there is simply no evidence, other than the appellant's testimony, to support this allegation. Indeed, all of the other evidence is to the effect that Dr. Rodgers was coherent, appeared to be alert, and seemed well aware of all that was going on about him before, during, and after his confession.

The expert psychological and psychiatric evidence is in the same category. To be sure, if the appellant did not know what he was doing when he waived his constitutional rights and confessed, the waiver would not be effective and the confession inadmissible. However, the most that can be said for the defense evidence on this point is that Dr. Rodgers was "confused". That is not enough to overcome all of the other evidence, including contrary expert opinions, to the effect that the appellant's waiver and his confession were voluntary acts of a conscious, intelligent mind.

## II.

The appellant contends that the trial court erred by not granting a new trial because of newly discovered evidence consisting of a psychological report of Dr. Daniel Taub and the testimony of Dr. Taub. The appellant was sent to the Arkansas State Hospital for a mental examination and the results of that examination ultimately were introduced into

evidence.

The evidence on the question of the appellant's mental capacity consisted of expert testimony from both sides, plus the written report from the State Hospital required by *Ark. Stat. Anno.* §43-1301. The substance of the appellant's evidence was that while he was legally responsible for his conduct, he suffered from diminished capacity under stress, both with respect to the ability to tell right from wrong and to knowingly and intelligently waive his constitutional rights. The State's evidence was to the effect that the defendant was legally sane and that he was competent to understand and intelligently waive his rights.

A *subpoena duces tecum* for all records relevant to the appellant's examination at the State Hospital was served on the State Hospital. In response, the State Hospital furnished its file on Dr. Rodgers. After the trial, it was discovered that the reports of Dr. Daniel Taub relative to his examination and tests of the appellant had been omitted from the State Hospital file. The appellant filed a motion for a new trial because of this newly discovered evidence.

A hearing was held on that motion at which Dr. Taub testified. The substance of Dr. Taub's testimony is as follows. The appellant had organic brain syndrome which reduced his mental capacity, particularly when he was fatigued or under stress. The appellant's condition was not different than that which would be expected in a person of his age. In fact, the appellant was better off than would be expected because of an above average I.Q. That is, the appellant was intellectually superior to the average seventy year old person. The appellant knew the difference between right and wrong. The appellant was not mentally defective. The appellant's "level of functioning" at the time he was examined was the equivalent of an I.Q. of 105 to 110. The appellant's organic brain syndrome was mild to moderate, and was certainly not severe.

The explanation of the missing State Hospital report was simply that Taub's report was not considered to be part of the file at the time the subpoena was served. Dr. Taub conducted the initial psychological examination and testing of

the appellant. Dr. Taub did not administer a complete battery of tests. However, Dr. Taub left his employment with the State in November of 1974 and went to work for the federal government. Dr. Oscar Kozberg was a staff psychiatrist at the State Hospital and was the State's primary witness on this issue. Dr. Kozberg testified that when he first reviewed the appellant's file, it was his opinion that Dr. Taub's psychological testing was incomplete. At the time of his initial review, Dr. Kozberg was aware that a defense psychologist was expected to testify. Dr. Kozberg felt that a complete battery of tests should be done. Therefore, Dr. Kozberg removed the report of Dr. Taub and directed Dr. John G. Althoff, a staff psychologist, to perform a complete battery of tests on the defendant. This was done. Dr. Kozberg also stated his opinion that the test results obtained by Dr. Althoff were not inconsistent with the results of Dr. Taub's tests. The trial court denied the appellant's motion for a new trial without specifying the reasons therefor.

A preliminary question deserves mention, to-wit, that of suppression of relevant evidence by the prosecution. That is not an issue here because it is admitted that no one connected with the investigation or the prosecution of the appellant was ever aware of the existence of Dr. Taub or his report until after completion of the trial herein. The omission of that report was strictly on an internal decision of the State Hospital staff which was never revealed to the prosecution.

Hence, the issue now before the Court is whether this was newly discovered evidence which would entitle the defendant to a new trial. Assuming that the Taub report was newly discovered evidence, that is not enough. New evidence, in order to justify a new trial, must be such as to render a different result in such new trial "probable." *Gross v. State,* 242 Ark. 142, 412 S.W. 2d 279 (1967).

That is not the case here. Dr. Taub's test results and his opinions were merely cumulative and in no way inconsistent with the tests and opinions expressed by other evidence presented by the State at the trial. As such, we perceive no way that this evidence, had it been available to the defense at the time of the trial, would have been likely to affect the ul-

timate outcome of the trial. Even if we assume that appellant was not aware of the identity of all those who had examined and tested him, we do not know why a timely direct inquiry as to their identity, independent of the subpoena duces tecum, would not have led to the information ultimately discovered after trial. Cf. *Townsend* v. *City of Helena*, 244 Ark. 228, 424 S.W. 2d 856, cert. den. 393 U.S. 917, 89 S. Ct. 244, 21 L. Ed. 2d 203. In any event, on this little favored ground for new trial, the trial judge had a considerable latitude of discretion. *Treat* v. *State*, 253 Ark. 367, 486 S.W. 2d 16; *Williams* v. *State*, 252 Ark. 1289, 482 S.W. 2d 810; *Cooper* v. *State*, 246 Ark. 368, 438 S.W. 2d 681. We cannot say that it was abused.

## III.

The appellant next contends that the trial court erred in admitting into evidence the State Hospital report on the ultimate issue of insanity. Here, the mandate of the statue is quite clear. *Ark. Stat. Anno.* § 43-1301 provides that:

". . . A written report prepared by the physician or physicians employed by the State Hospital shall indicate separately the defendant's mental condition during the period of the examination and his probable mental condition at the time of the alleged offense."

The report which was admitted into evidence conformed to the requirement of the statute. The admissibility of such a report has been established by this Court in *Nail* v. *State*, 231 Ark. 70, 328 S.W. 2d 836 (1959). In *Downs* v. *State*, 231 Ark. 466, 330 S.W. 2d 281 (1959), this court addressed the issue of the right of confrontation. There we held, citing the *Nail* case, that the right to confront witnesses is not impaired unless the defendant is denied the right to question the doctors who examined him. *Nail* v. *State, supra*. Here, the appellant in fact did have an opportunity to question those who examined him. And the appellant was free to, and in fact did, present contradictory evidence and rebuttal witnesses on the questions of his sanity and mental capacity.

We, therefore, conclude that the appellant's contention is without merit and the State Hospital report was properly admitted into evidence.

The appellant next contends that the trial court erred in denying him the right to have a daily copy of the trial proceedings. The appellant requested that he be furnished with the official court reporter's copy of the daily proceedings. The court reporter stated that it would be impossible to comply with such a request and the trial court rightfully refused it. The appellant next requested that he be permitted to employ his own court reporter. This request was also refused by the trial court. The appellant asked what he could do to obtain this information. The trial court stated that the appellant could either have a stenographer take notes, those notes not to constitute an unofficial verbatim transcript, or that the appellant could use an electronic recorder to be operated by counsel for the appellant. The appellant's counsel took advantage of neither alternative.

We need not here delineate the bounds of any right a criminal defendant might have to obtain a daily copy of the transcript of the proceedings. We have concluded that the trial court did not here abuse its discretion because the alternatives it provided appellant's counsel were reasonable under the circumstances, and we are unable to say that appellant suffered any prejudice.

## V.

The appellant contends that he should have been permitted to discover the personnel file of Policeman Lester because it contained information which would tend to impeach Lester's credibility as a witness. It was alleged that the State Police had taken disciplinary action against Lester twice, once shortly before and one shortly after Lester obtained the appellant's confession herein. It is undisputed that the disciplinary action was in another case and was totally unrelated to the Rodgers' murder investigation. The trial court examined Lester's personnel file *in camera* and determined that nothing therein was material to the Rodgers' case. Accordingly, the trial court refused appellant's request for discovery and also refused to seal Lester's personnel file and make it a part of the record herein. The appellant contends that this was reversible error.

The record herein is clear that the appellant's counsel was already aware of the facts surrounding Policeman Lester's discipline by his employer. The trial court permitted the appellant to cross-examine Lester in detail about the facts surrounding his discipline. Lester admitted on cross-examination all aspects of the occurrence, including having given deceptive responses in a polygraph examination.

There is no contention in this appeal that Lester's testimony on cross-examination was in any way inconsistent with the information contained in his personnel file. The appellant does not contend that the personnel file itself, or any part of it, was admissible in evidence. Rather, it is argued that the information it would have revealed would have been useful in cross-examining Lester. However, this information was already known to appellant's counsel. Furthermore, it was, in fact, used by him in his cross-examination of Lester. The common law recognized no right of discovery in criminal cases. *Shores* v. *U.S.*, 174 F. 2d 838, 11 ALR 2d 635 (8th Cir., 1949). The right to discovery in such cases is generally governed by statute. At the time of appellant's trial there was such a statute in Arkansas. *Ark. Stat. Ann.* § 43-2011.2 et seq (Supp. 1975). This statute would not have required that appellant's attorney be permitted to inspect Lester's personnel file. There are valid policy reasons for maintaining confidentiality of such files. *People* v. *Coleman*, 75 Misc. 2d 1090, 349 N.Y.S. 2d 298 (1973). Still, the trial court has some discretion in the matter of discovery when impeaching matter is concerned. *Shores* v. *U.S.*, supra; *Graves* v. *State*, 489 S.W. 2d 74 (Tenn. Cr. App. 1972). But, in the exercise of discretion the necessity for a defendant's searching confidential matter must be weighed against the public policy of confidentiality of secrecy. *People* v. *Coleman*, 75 Misc. 2d 1090, supra; *Commonwealth* v. *Dominico*, 306 N.E. 2d 835 (Mass. App. 1973); *U.S.* v. *Iozia*, 13 F.R.D. 335 (1952). Cf. *Arnold* v. *State*, 179 Ark. 1066, 20 S.W. 2d 189. This, the trial court may do by an *in camera* inspection of the material sought. See, *U.S.* v. *Nixon*, 418 U.S. 683, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 *Commonwealth* v. *Dominico*, supra; *People* v. *Bottom*, 76 Misc. 2d 525; 351 N.Y.S. 2d 328 (1974). *U.S.* v. *Olin Mathieson Chemical Corporation*, 36 F.R.D. 18 (1964). Since defense counsel was permitted a wide latitude in cross-examination and had drawn

admissions from the witness which could be taken as damaging to his credibility, we are unable to say that the trial court erred to the prejudice of appellant. See *Turner* v. *State,* 258 Ark. 425, 527 S.W. 2d 580; *State* v. *Miller,* 35 Wis. 2d 454, 151 N.W. 2d 157 (1967).

## VI.

The appellant contends that the trial court erred by admitting into evidence photographs of the deceased. The appellant had agreed to admit and/or stipulate all relevant facts shown by those photographs. It is argued that the appellant's willingness to stipulate, coupled with the fact that the photographs were by their nature inflammatory, rendered these exhibits inadmissible.

The admissibility of photographs is a matter within the discretion of the trial court. *Perry* v. *State,* 255 Ark. 378, 500 S.W. 2d 387 (1973). *Lee* v. *State,* 229 Ark. 354, 315 S.W. 2d 916 (1958). The photographs in question were color shots of the deceased's remains as discovered at the crime scene. To be sure, the subject matter of the photographs would alone tend to justify their characterization as gory and, at least to some extent, inflammatory. However, the photographs were material, relevant and accurate. And in no way did they seek to exaggerate or even emphasize blood and gore.

In *Perry* v. *State,* supra, we noted that the inflammatory nature of a photograph would not alone render it inadmissible. The same thing is true of the opposing party's willingness to admit or stipulate certain facts shown by the photograph; e.g., the fact, cause, and place of death. The test should always be whether any necessarily inflammatory tendency of a photograph is outweighed by its probative value. If a photograph sheds light on any issue; or if it assists witnesses to better describe a crime scene; or if it in some other way materially helps the jury to understand the testimony; then its admissibility into evidence is within the sound discretion of the trial court. We find that these principles were applied here. Therefore, the trial court's ruling on the admissibility of the photographs was not an abuse of its discretion.

## VII.

The appellant argues that the prosecution knew in advance of jury selection and trial that its evidence would not support a capital felony murder conviction. The State, it is argued, used this charge to allow it to qualify a death penalty jury. The appellant was, of course, convicted of a lesser charge, murder in the first degree. The appellant contends that filing the more serious charge is reversible error unless there is evidence in the record which would have sustained a jury verdict of guilty to the charge of capital felony murder. There is no contention by the appellant that the death penalty jury was improperly qualified under the guidelines established in *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968). The appellant merely argues that the jury so qualified would be prosecution oriented to the extent that it could not fairly pass on the issue of guilt or innocence. This argument is without merit.

The appellant's argument is neither factually nor legally sound. In the first place, a thorough review of the record convinces us that there was evidence from which the jury could have concluded that the appellant was guilty of capital felony murder. In substance, there was evidence to the effect that it was intended that Kimbrell rob Mrs. Rodgers in addition to killing her. In any event, we do not accept as valid the proposition that a jury qualified to return a death penalty is necessarily prejudiced on the question of guilt or innocence. On this point we agree with the following statement of Mr. Justice Stewart in the *Witherspoon* case.

> We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968).

## VIII.

The appellant contends that the trial court erred in instructing the jury on the issues of confession and insanity. The

trial court gave four instructions related to the jury's consideration of the appellant's confession. It gave five instructions related to insanity and reduced mental capacity. There is no need to further lengthen this opinion by repeating these instructions. We have reviewed each instruction individually, as well as reviewing the instructions on each issue collectively. We have concluded that the trial court's instructions were correct statements of the applicable law which fully and completely instructed the jury on the issues in question. Further, we have reviewed the instructions offered by the appellant and refused by the trial court. We find that each of the instructions so refused was either repetitious, argumentative, or contained an incorrect statement of the law. Accordingly, we hold that no error was committed by the trial court in instructing the jury. We have reviewed other objections made in the trial court and find none which merit reversal or further discussion.

For the reasons stated above, the judgment of the lower court should be, and the same hereby is, affirmed.

HOLT and HICKMAN, JJ., not participating.